## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA

Christopher Gary Baylor,

   *Plaintiff*,

Case No:

Complaint for
(Violation of Rights under
the First, Ninth and
Fourteenth Amendments
and Civil Rights Acts)

   v.

The Florida Ku Klux Clan for
The Traditionalist Americans,
United Northern and Southern
Knights Chapter, and Ladies of
The Invisible Empire,

   *Defendants*.

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1   ## I. INTRODUCTION

2   Plaintiff, Christopher Gary Baylor ("Baylor"), respectfully seeks injunctive relief

3   from Defendants' intentional deprivation of his Civil, Human and Constitutional Rights,

4   which Defendants unlawfully strip the United States of its jurisdiction to guarantee, if not

5   protect, non-indigenous Negros/Blacks/African Americans of any unlawful infringement

6   of fundamental rights by the imposition of *judge-made laws* in its place. Without any

7   Legislative authority enacted by Congress whatsoever, Defendant: Charles T. Canady,

8   Ricky Polston, Jamie R. Grosshans, Jorge Labarga and John D. Couriel, Grand Knight

9   Hawks of the klavern ("the Grand Knights"), and; Brian D. Lambert, F. Rand Wallis,

10   James A. Edwards, Eric J. Eisnaugle and John M. Harris, Exalted Cyclops' of the klavern

11   ("the Exalted"), and; Robert Morris, Craig C. Villanti, Suzanne Labrit, Daniel H. Sleet,

12   and Anthony K. Black, Loyal White Knights for the klavern ("the Loyal Whites"), and;

13   Curtis Jacobus, White Devil of the Klavern ("the Devil"), and; John Tomasino and Mark

14   Clayton of the Ku Klos Knights of the klavern ("the Klos Knights"), and; Patricia J.

15   Kelly; Sandra B. Williams and Mary Elizabeth Kuenzel of the Ladies of the Invisible

16   Empire ("the Ladies") individually, and collectively as Defendants, purport that Baylor

17   has no Civil, Constitutional, Human, Natural or any known rights that Whites in the State

18   of Florida are bound to recognize or respect.

19   To support this strong resistance against the equal distribution of rights for Blacks,

20   the seritipiciously patriotic White Devil and fraternal organizations of White supremacists,

21   have disturbingly reemerged as State officials donned in black robes unhooded, to infiltrate

22   legal proceedings under color-of-law, to follow the prevailing tendencies that the Ku Klux

23    Klan have historically used to engage in strategic efforts to incite unbounded terrorism

24    against Blacks, such as Baylor, and other colored people similarly situated.

25          What began as a vindication or restoration of a single right, unalienable in nature, has

26    spanned across five (5) years. Generally, *habeas corpus* petitioners and those in domestic

27    relation cases normally rehash the same issues and are most routinely deemed as frivolous,

28    malicious, serial or vexatious litigants by court. However, nowhere in history has a single

29    litigant, other than Baylor, contested so many legal issues, in every facet of the courts under

30    sound legal theories, and in multiple jurisdictions encompassing housing, marital, familial,

31    parental and employment rights in civil cases, but has been denied under every known law

32    liberally afforded to Whites, who are similarly situated.

33          Baylor has pleaded his cases and claims with as much respect, clarity, and accuracy

34    humanly possible within the ambit of resources and financial limitations of an unrepresented

35    party. He has presented salient facts and evidence under the most least intrusive methods —

36    as a matter of course, and with respect to preserving the court's time and judicial resources.

37    Baylor has not filed excessive pleadings, other documents or cases, and has not been found

38    prohibited from making submissions or instigating new suits or actions in any court.

39          With more than 16,128 hours of law research, study, writing, including legal aid to

40    more than 300 litigants, Baylor remains encumbered due to ethnic bias and discrimination in

41    the process. Here lies serious moral implications under which Baylor should not be made to

42    continuously suffer because of the discriminatory acts and conduct of Klan members.

43          The reason for Baylor's demise lies in the fact that the above-named Klan members

44    rely on color of law to enforce unspoken customs, practices or policies that willfully delay,

45   deny and deprive him of any rights on every occasion, at every step and stage of litigation,

46   in excess of five (5) years, in more than sixty (60) non-frivolous, non-malicious, non-serial

47   or non-vexatious proceedings dismissed without the granting of a single iota of meaningful

48   equitable or lawful relief, remedy or redress.

49       For example, in one half-dozen proceedings, Baylor sought relief from the refusal to

50   issue to him, a simple copy of a final appellate decision formally requested and required to

51   be given under Florida State Rules and Statute. Though, to date, Baylor has never received,

52   nor has been provided with a copy. According to White-American jurisprudence, Notice is

53   said to be one of the most basic tenants of Due Process. Yet, in Baylor's circumstance, since

54   he is Black, he is shown **NOT** to have the same basic rights that Whites are given without

55   sale, denial or delay.

56       In another one half-dozen or more other proceedings, Baylor has been deprived and

57   denied of the requisite Notice of standard court acknowledgments, acceptances, pending

58   issues, filings, dismissals or other entries on the court docket with respect to the state of his

59   past appellate court proceedings.

60       Most notably, this first occurred following Baylor's submission of two Motions to

61   Disqualify several Klan members in the State's appellate court on or about December 2021.

62   Since that time, Baylor has not been provided with any Notice of his applications for appeal,

63   or in any case seeking extraordinary writ relief in excess of two (2) years. The highest court

64   has also declined to grant Baylor relief based on the matter of lack of Notice asserted herein.

65       Klan members have on numerous occasions adopted silence when the issues raised

66   are highly complex, novel, sensitive or fundamentally important or especially and strongly

67    implicate invidiously discriminatory conduct or acts that invalidate Statutes, Rules, policies,

68    procedures, practices, regulations or customs exercised without regard for Baylor's most

69    basic rights.

70        At present, one of several fundamentally important questions of public importance

71    remains at issue that affects the rights of the public, causes irreparable harm, and is largely

72    upheld by Florida when currently declared unconstitutional by the majority of other States.

73    But because the State forum is substantially biased, Baylor has no opportunity to be heard

74    on matters of public importance. The Klan members adamantly refuse to render any written

75    opinion at any time it would show that a Black/Negro would invalidate White laws designed

76    to protect Whites only. These outrageous acts can only be characterized as targeted bias.

77        As punishment against Baylor, the Klan members have resorted to delaying issuance

78    of any relief in Baylor's cases for up to one (1) year, or in as little as (8) eight months, in

79    order to cause his cases to lose justiciability under the "mootness" doctrine. The deprivation

80    and denial of Baylor's rights surpasses mere court tactics, or the efficient management of

81    court dockets.

82        In other cases, Klan members have openly advocated on behalf of adverse parties by

83    *sua sponte* raising waived defenses without any opportunity to rebut, which were neither

84    argued nor raised by either party; or converted the adversarial process between Baylor and

85    defendant, between Baylor and the court; or questioned the veracity of Baylor's arguments

86    under a credibility standard based on emotional and personal animus during oral hearings,

87    which contravenes the pre-trial standard for dismissal upon Motion; or judged the merits of

88    Baylor's case(s) in lieu of an actual trial; or allowed other parties consecutive continuances

89    by use of dilatory tactics, and filing of pleadings without leave of the court under no legal

90    standard or cause, but denied Baylor's every request; or refused to recuse or disqualify upon

91    showing bias validated by witnesses on evidence of affidavit(s), etc.

92        There are a substantial number of deprivations in the underlying cases and ongoing,

93    although it would be cumbersome to list every violation of Baylor's fundamental rights,

94    some more than eighty (80), which have occurred since 2018'. For example, in a 2018 case,

95    Baylor was deprived of Notice of hearing, then denied the right to be heard on rehearing.

96    Even though it is well settled that "case[s] [are] remanded to the trial court so that it may be

97    heard upon proper notice. Fla.R.Civ.P. 1.090(d); Edward L. Nezelek, Inc. v. Sunbeam

98    Television Corporation, 413 So.2d 51 (Fla. 3d DCA) pet. for rev. den., 424 So.2d 763 (Fla.

99    1982); Devoe Raynolds Company, Inc. v. KDS Paint Company, Inc., 382 So.2d 126 (Fla.

100    4th DCA 1980), access to such rights have alluded Baylor for more than five (5) years.

101        As a matter of importance, it should also be said that in other cases where a staunch

102    absence of constitutional or statutory authority has otherwise been shown upon challenge,

103    Baylor's cases are allowed to be dismissed under the authority of mere clerks who act as the

104    first line of defense in disposing of cases brought by unrepresented Blacks, which receive

105    little to no oversight, but are terminated without lawful reason, under color of law, without

106    written opinion, and without a customarily signed Order by a judge or justice, but rather and

107    solely on the authority and signature of non-judges.

108        In other words, the discriminatory conduct noticed by Baylor is not subjective, rather

109    based on clear evidence and salient facts after witnessing routine tactics Klan members have

110    deployed against Blacks for more than three centuries. Every act is preserved on the face of

111    numerous records, which cannot be disputed.

112         While Complaints are mainly comprised of mere allegations, the facts stated herein

113    are indisputable. The Klan members have clearly created what constitutes or falls within the

114    ambit of *forum non conveniens*, when such acts are so frequently biased, nothing can be

115    gained by presenting any issue in a biased State forum. Baylor has been retaliated against

116    because he is Black, and exhibits a shared knowledge of laws created by, and for Whites

117    only, but without reaping any privileges or benefits by participating in proceedings for the

118    fair adjudication of basic and fundamental rights that are similarly raised by Whites, who

119    receive favorable outcomes. However, Baylor has been barred from receiving any equitable

120    or lawful relief, remedy or redress for five (5) years.

121         On every occasion, Klan members have proven that under no set of circumstances,

122    Baylor will **<u>NEVER</u>** be entitled to have any substantive issues fairly heard or decided, from:

123    the mere receipt of requisite Notice, to decisions that quell moral or judicial misconduct and

124    thereafter vacatur of void Orders as a result of violating Due Process, including the denial of

125    the right to appeal upon timely Notice given, which is currently becoming more conclusive

126    of the fact that Baylor has no rights that any Whites are bound to respect or recognize. There

127    is no conceivable basis for denial in every case in every situation, and it cannot be said that

128    the Klan members are operating without invidiously racial or ethnic discrimination towards

129    Baylor, or that the Klan members are acting within any known boundary of law, including

130    the constitutions, which are solely instituted to protect Whites/Anglo-Americans or those of

131    European descent. Still, the Klan members fail to find in Baylor's cases, lawful or palpable

132    reasons to deny or deprive him of his Civil, Human or Constitutional rights, other than by

133    the use of racial bias or discrimination, a wheel-less vehicle for White southern terrorism.

134    While the above stated merely elicit a cursory review of the totality of the pyramid of

135    violations, are by no means exhaustive, but what remain are fundamentally important issues

136    that may be brought before this court for the issuance of prospective relief to prevent further

137    injury.

138    Real and justiciable controversies exist based on the Defendants' acts or conduct,

139    including the practices, customs or policies repeatedly used against Baylor that violate his

140    fundamental and basic rights, if in fact, he has any rights at all, to the contrary. Thus,

141    equitable and lawful declaratory and injunctive relief are requested to resolve these

142    controversies.

143    Defendants' conduct is otherwise inconsistent with law established by the United

144    States under the Civil Rights Acts, Fair Housing Act(s), First, Ninth and Fourteenth

145    Amendments under the U.S. Constitution, including the Supremacy Clause, therefore

146    Baylor respectfully asks that this Court enjoin Defendants from acting further under all.

(Reserved for Amendment)

## II. JURISDICTION AND VENUE

1.      Jurisdiction is proper under 28 U.S.C. §§ 1331 and 1343(a)(3), because the Plaintiff's claims arise under the First, Ninth and Fourteenth Amendment and other laws of the United States, including 42 U.S.C. §§ 1983, 1985, 1986, 1988, 42 U.S.C. §§ 3601 and 3617, and 42 U.S.C. § 2000d.

2.      This Court has authority to declare the rights of any party requesting such declaration in a case of actual controversy within its jurisdiction pursuant to 28 U.S.C. §§ 2201–2202.

3.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) and (e).

## III.   PARTIES

8. Plaintiff, Christopher Gary Baylor, is an indigent, non-indigenous Native African American/Black *sui juris*, homeless military veteran and former administrator of military records and the Uniform Code of Military Justice. Mr. Baylor is a resident of Brevard County in the State of Florida.

9. Defendants, Charles T. Canady, Ricky Polston, Jamie R. Grosshans, Jorge Labarga and John D. Couriel are Grand Knights of the klavern, and pose as Justices for the Florida supreme court. At all times relevant to the assertions made hereafter were acting under color of law. They are named herein as Defendants in their individual capacities.

10.      Defendants, Brian D. Lambert, F. Rand Wallis, James A. Edwards, Eric J. Eisnaugle and John M. Harris are Exalted Cyclops' of the klavern, and pose as judges in and for the Florida Fifth District Court of Appeal. At all times relevant to the assertions

169   hereafter were acting under color of law. They are named herein as Defendants in their

170   individual capacities.

171        11.   Defendants, Robert Morris, Daniel H. Sleet, and Anthony K. Black are

172   Traditionalist American Knights, and pose as judges for the Florida Second District

173   Court of Appeal. At all times relevant to the assertions made hereafter were acting under

174   color of law. They are named herein as Defendants in their individual capacities.

175        12.   Defendant, Curtis Jacobus is the White Devil for the klavern, and poses as a

176   judge for the Eighteenth Judicial Circuit Court for Brevard County. At all times relevant

177   to the assertions made hereafter was acting under color of law. It is named herein as

178   Defendant in its individual capacity.

179        13.   Defendants, John A. Tomasino and Mark Clayton are Ku Klos Knights for

180   the klavern, and pose as court clerks and judges for the Florida supreme court. At all

181   times relevant to the assertions made hereafter were acting under color of law. They are

182   named herein as Defendants in their individual capacities.

183        14.   Patricia J. Kelly, who poses as a judge, and Mary Elizabeth Kuenzel and

184   Sandra B. Williams who pose as court clerks and judges, are Ladies of The Invisible

185   Empire for the klavern. At all times relevant to the assertions made hereafter were acting

186   under color of law. They are named herein as Defendants in their individual capacities.


(Reserved for Amendment)

## IV.  FACTUAL BACKGROUND

### i.  Historical Background

187

188

189    15.    When the United States Constitution was first written, it was employed to

190    secure the rights of Whites only, which remains equally true to date. The Civil Rights

191    Act of 1866 was the first artifice created to somewhat define U.S. citizenship, alleging

192    that all citizens were equally protected by law, still cited in Supreme Court cases dealing

193    with discrimination.

194    16.    While the Civil Rights Act of 1866 contributed to Black Americans' access

195    to certain relief in American society, specifically, "to sue, be parties, and give evidence. .

196    . and to full and equal benefit of all laws and proceedings for the security of person and

197    property, as is enjoyed by White citizens," it is now merely codified as 42 U.S.C. §1981,

198    which was revised and amended by subsequent Acts of Congress to narrowly apply to

199    the granting of relief in cases of employment discrimination.

200    17.    In the same manner Defendants use judge-made law to supersede acts by

201    State legislatures, the United States Supreme Court, roughly eight years following the

202    enactment of the Civil Rights Act, through its own volition in the Civil Rights Cases of

203    1883, and in spite of Congress, laws or the Constitution, said the public accommodation

204    sections of the Civil Rights Act were unconstitutional, thus proving that the guarantee of

205    constitutional rights are an artificial approach and an illusion of justice when its legal

206    significance is never a solidified determination of any actual rights that may be canceled,

207    reconstituted, reconstructed or overridden at anytime by the very same people who

208    created them.

209    18.    As a result, Black people, though alleged to be legally "free" U.S. citizens,

210    continue to face uncontrolled discrimination in all areas of American society, economics,

211    and politics, avoided by the legislative and executive branches, leaving Black people to

212    suffer from inequities and misapplications of judge-made laws. While it may be true that

213    history is not always written by the victors, it can be said that the victors diminish the

214    influence and existence of the conquered' rights.

215    19.    During the 1800's, the Ku Klux Klan (KKK) was founded and spread

216    throughout almost every southern State. This radical group largely prevented the 1866

217    Civil Rights Act from being immediately implemented to secure the civil rights of Black

218    people, and although they are well hidden amidst the chaos in today's American society,

219    they still exist.

220    20.    In 2015, State official ties to the Ku Klux Klan were found in the town of

221    Fruitland Park, Lake County, Florida. Though the Deputy Chief resigned, denied KKK

222    membership. But law enforcement never treats White domestic terrorism as aggressively

223    as it has with Black radicals or international terrorists. Mark Potok, at the Southern

224    Poverty Law Center, who monitors hate groups said, "*the KKK used to be politically*

225    *powerful in the 1920s, when governors and US senators were among its 4 million*

226    *members, nowadays it is much less active than other sectors of the radical right and has*

227    *less than 5,000 members nationwide*."

228    21.    Nonetheless, neither membership or activity can be quantified by statistics,

229    and neither can state of mind. Nothing precludes Defendants from bellying the same

230    supremacist, nationalist and other extremist tendencies that are clearly exhibited by

231     millions of Whites in Americans each day, who often, as the sun shines, reveal and share

232     vile and hostile "speech" on hundreds of worldwide and proprietary digital platforms for

233     hate; e.g. Omegle, Facebook, WhatsApp, Instagram, WeChat, TikTok, Twitter, Snapchat

234     and YouTube, etc, in exercise of so-called First Amendment Rights, clearly a White first

235     privilege.

236         22.    Because it can generally be seen in every activities, White American racism

237     is a systemic problem, affecting all Whites through naturally pervasive and inherent

238     patterns of virulent like behavior taught pre-adolescence, later perpetuated by television,

239     radio, newspapers, billboards, schools, hate speech gatherings, meetings, books, music,

240     movies etc. Whites see themselves every-where every-day.

241         23.    In the legal context, with respect to the Defendants in this case, racism is a

242     well-oiled machine driven by nefarious actors such as U.S. Supreme Court Justice Alito,

243     who promotes "White Racial Innocence," including former Florida Supreme Court Chief

244     Justice, now Justice Charles T. Canady, who barred courses that insist on diversity.

245         24.    Given the global comparisons, the Defendants' sheer conduct in itself gives

246     rise to an inclination towards racism, when the very society they live is but an everyday

247     reflection of niches that reinforces their views and goads them to terrorism against

248     Blacks, whether acted on consciously or unconsciously. Though in this case is clearly

249     willfully. In retrospect, violence is as old as the earth, however now violence can also be

250     classified as an act of distortion, infringement, or profanation directed against a single

251     person, a group, or a community, which can be intentional or unintentional, actual or

252     threatened, such as the outrageous acts against Mr. Baylor.

253                    ii.   <u>Assertions of Named Plaintiff</u>

254     A.  <u>Post-Determination Due Process of Notice is also Required</u>

255       a)   <u>Understanding the Justice Gap Between Legal Needs and Service Untendered</u>

256      25.   On December 25, 2020 at 9:10PM, Baylor as Plaintiff, filed Notice to

257 appeal a non-final Order entered against him on December 17, 2020 at 1:43PM, denying

258 injunctive relief in an independent action which solely relied on a two day-old Motion to

259 Dismiss, filed on December 15, 202 at 5:39PM, by a White party represented by a White

260 attorney citing to outdated law no longer applicable in the State of Florida.

261      26.   The crux of the non-final Order appealed from, under color-of-law, alleges

262 that Baylor had no right to injunctive relief, which heavily relied on a White attorney's

263 Motion filed roughly one day prior. However, Baylor was privy to the fact that Florida's

264 Legislature and Governor Ron Desantis, under House Bill 255, amended several statutes

265 pertaining to the Florida Commission on Human Relations ("FCHR"), including Florida

266 Fair Housing Act ("FFHA"), which allows a person alleging housing discrimination to

267 now file civil action without first having to "exhaust" administrative remedies.

268      27.   Nonetheless, the Order entered on December 2020 denying injunctive relief

269 against housing discrimination, goes beyond mere mistake when entered against Baylor

270 absent any consideration of the above-facts, but made solely on the fact that Baylor is

271 Black asserting FFHA claims against Whites.

272      28.   Given at the time, Baylor's first-hand experience with Florida judges' one-

273 dozen biased rulings against him, determined that rehearing was fruitless. But because of

274 his lack of experience at the time, with the Florida Fifth District Court of Appeal ("5th

275    DCA"), Baylor directly appealed ("the First Appeal") the denial for injunctive relief.

276        29.   In a second suit related to the first action, where *personam* jurisdiction was

277    allowed by "sewer-service"[1] against Baylor as Defendant, on May 27, 2021 at 5:41PM,

278    Baylor filed a second Notice to appeal ("the Second Appeal") a default judgment against

279    him entered May 17, 2021 at 8:31AM, where after Baylor did in fact file a "Motion for

280    Rehearing May 27, 2021 at 2:32PM," as seen below:

> **MOTION FOR REHEARING AND TO CERTIFY QUESTIONS OF**
> **GREAT PUBLIC IMPORTANCE**
>
>     **COMES NOW,** the Defendant, Christopher Baylor, in the above-styled case, by and through the undersigned, pursuant to the Florida Supreme Court amended Florida Rule of Civil Procedure 1.530, In re: Amends. to Fla. Rule of Civil Procedure 1.530 & Fla. Fam. Law Rule of Procedure 12.530, No. SC22-756, slip op. at 1 (Fla. Aug. 25, 2022)(emphasis added), to respectfully move this court for Rehearing in the above-styled cause, and would state that this case is of exceptional importance, and as grounds for Rehearing states:
>
>     1.   The Defendant argues that this court's final judgment entered on November 3, 2022 misapprehends State law and overlooks relevant federal authority which results in the repeated violation of Defendant's First and Fourteenth Amendment rights to the United States Constitution, including Civil Rights.

281

282        30.   The court however, on the same day, at 4:13PM, entered an Order against

283    Baylor, implicitly denying him of the right to fair housing, as shown below, stating:

>     It is hereby **ORDERED** and **ADJUDGED** as follows:
>
>     The Defendant's Motion to Stay at the following address is **DENIED**:
>
>     1111 Kennedy Court, Apt 46, Titusville FL 32780

284

---

[1] "Sewer service is defined as 'failing to serve a debtor and filing a fraudulent affidavit attesting to service so that when the debtor later fails to appear in court, a default judgment is entered against him." Freeman v. ABC Legal Services, Inc., 877 F. Supp. 2d 919 (N.D. Cal. 2012).

285        31.    The Order, abruptly made without hearing and under two (2) hours, states

286    that Baylor may no longer reside at property, 1111 Kennedy Court, Apt.46, Titusville,

287    FL 32780, although at no time did Baylor seek a "stay" as defined by Fla. R. Civ. P.

288    1.570, Fla. R. Civ. P. 1.550(b) or Fla. R. App. P. 9.310(a), nor did he seek to *physically*

289    *stay* at the property noted in the Order, in the caption nor body of Baylor's Motion.

290        32.    Accordingly, like in his first housing action, Baylor filed Notice to appeal

291    the entry of default judgment and Order denying him of housing rights, to the 5th DCA

292    ("the Second Appeal") after being denied rehearing, which Baylor had already initially

293    determined in the first action was fruitless, a clearly objective fear and finding that bias

294    existed in both cases as evinced above, thus two appeals followed.

295        b)  <u>On an Unappealing Road to Appellate Bias</u>

296            1)  <u>Baylor's First Appeal</u>

297        33.    In Baylor's First Appeal filed December 25, 2020 in the 5th DCA, his case

298    was tactfully delayed so that no relief could be issued. In that case, no final decision was

299    made until eight (8) months later, then denied as moot August 11, 2021, as shown below:



> ORDERED that the above-styled cause is hereby dismissed as
> moot.
>
> *I hereby certify that the foregoing is*
> *(a true copy of) the original Court order.*
>
> *Sandra B. Williams*
>
> SANDRA B. WILLIAMS, CLERK

300

301        34.    There was no apparent reason other than bias, Baylor should have been, and

302    continue to be denied of the fundamental right to ever reside at his previous residence for

303    the remainder of his lifetime, especially in the event said property was no longer owned

304    by the adverse party, which substantially denies Baylor of fair housing rights in a Black

305    community with no or limited affordable housing.

306        35.    Like other submissions, Baylor's response brief to a Order to Show Cause

307    threatening dismissal, was based on clear legal reasons and authority to hear matters in

308    his First Appeal, and were against the application of mootness, as shown below:



309

310

> 152    "The rule that an appellate court limits its review to the issues
> 153    necessary to a proper disposition of the appeal, and will not consider
> 154    immaterial or moot questions, applies when reviewing decrees and
> 155    orders relating to injunctions." 42 AM. JUR. 2D Injunctions § 335
> 156    (2000). However, if a decision by the trial court may affect future
>
> 10
>
> 157    events, or have collateral consequences for the parties, an appeal
> 158    from that decision is not moot, even though the appellate court
> 159    cannot give effective relief in the present case. *See* 5 AM. JUR. 2D
> 160    Appellate Review § 649 (1995).

311    36.    Baylor further made clear in his brief, arguments and persuasive authority

312    against the adoption of the mootness doctrine. Nevertheless, an Order rendering his case

313    moot was entered against the granting of any such relief, in addition to other matters,

314    that were not moot and should have been heard, including relief against the enforcement

315    of the Order that denied Baylor of the right to "stay," at specific property, the right to

316    fair housing, which States have no right to deny.

317            2)  Baylor's Second Appeal

318    37.    Likewise, in Baylor's Second Appeal initiated on May 27, 2021 in the 5th

319    DCA, no final opinion was issued until more than one (1) year later, on the same month

320    of August 11, but in 2022.

321        38.   However, in Baylor's Second Appeal, bias became more apparent when a
322 White attorney for a White party was allowed to abuse Motion practices by repeatedly
323 filing successive continuances in order to cause unnecessary delay in that appeal, which
324 Baylor promptly opposed, yet all of the White attorney's Motions were granted while
325 Baylor's every Motion was denied.

326        39.   It was not until Baylor's fourth Motion written and submitted in opposition
327 to the White party's White attorney's fourth dilatory Motion filed October 18, 2021, was
328 disqualification found necessary to respond to conduct that was not only the consecutive
329 delay of cases and denial of Motions against the allowance of abusive Motion practice,
330 but the fact that Baylor's fourth Motion was denied when the Order denying his Motion
331 was essentially granted on the same basis of relief that Baylor requested, as seen below:

---

### INTRODUCTION

(4)    Since Baylor filed his first Initial Brief and Appendix, Carreja himself has filed

1

---

four consecutive dilatory Motions masked to decline or extend time for filing its Answer brief.
Now days before its Answer brief is due, Carreja once more files another dilatory Motion for the
purpose of delaying Baylor's appeal.

(5)    Given Carreja's wholly unbridled ability to consecutively file lengthily detailed
Motions (instead of an Answer Brief) squarely attacking the merits of Baylor's appeal, this court
should forthrightly deny Carreja's fourth dilatory motion as a matter of law — if not for good
cause, Due Process, in the interest of justice or *ex gratia*.

332

333          40.   Instead of showing any sign of granting proposed relief in a Motion written

334   by an unrepresented Black litigant, Baylor's Motion was denied even upon a showing of

335   authority upheld by the same court, where specified relief was sought, as shown below:

> (22)   Carreja's dilatory Motion masked as an extension of time should compel this court to follow its own history of decision-making found in Slizyk v. Smilack, 734 So. 2d 1166 (Fla. 5th DCA 1999), where this court "warn[ed] that motions are not to be used to present arguments which should be addressed in the briefs. . . nor to delay the progress of the appeal. [Carreja] in this case ha[s] pushed the limit of this court [and Baylor's] patience and tolerance. Should [Carreja] continue to file spurious motions, this court [must] take action to prevent and punish continuing motion practice abuses."
>
> (23)   Attorneys handling appeals in [Appellate] court have a professional responsibility to have a working knowledge of the Rules of Appellate Procedure and to act in a way that does not force the opposing party or the court to expend time and effort on baseless matters. Lopez v. State Farm Fla. Ins. Co., 114 So. 3d 991 (Fla. 5th DCA 2012).
>
> (24)   Accordingly, Carreja's Motion to Strike must be denied.
>
> 5

336

337          41.   Nonetheless, an Order was entered October 19, 2021 against Baylor. While

338   the Order denied another continuance, contemporaneously denied Baylor, who is Black.

> DATE:  October 19, 2021
>
> **BY ORDER OF THE COURT:**
>
>     ORDERED that Appellee's "Motion to Dismiss or, in the Alternative, Motion to Strike Initial Brief and Appendix," filed October 13, 2021, is denied. It is further
>
>     ORDERED that Appellant "Baylor's Motion to Deny and Strike . . . ," filed October 18, 2021, is denied.
>
> *I hereby certify that the foregoing is*
> *(a true copy of) the original Court order.*
>
> *Sandra B. Williams*
>
> SANDRA B. WILLIAMS, CLERK

339

340  42.  Baylor discovered that no degree of pleading, even on the same grounds as

341  Whites shown above, could or would allow Blacks to be granted any relief by Whites.

342  43.  Discrimination against Baylor was made all the more apparent when in

343  addition to excessive delay and denials, without leave, the White attorney for the adverse

344  White party was permitted to file its Answer brief without first seeking permission from

345  the court to do so, months late, which Baylor also opposed but was once more denied.

346  44.  Baylor's Motions in response to would-be Motions for dismissal cloaked as

347  nothing more than Motions for continuance were all denied. But if Baylor were White

348  and represented by White counsel, he would not have been denied nor delayed.

349  3)  <u>In Both Appeals</u>

350  45.  Due to a subset of the foregoing reasons, in both appeals, Baylor filed two

351  Motions to Disqualify, the first of which is shown below, against Defendant, specifically

352  Brian D. Lambert, F. Rand Wallis, James A. Edwards, Eric J. Eisnaugle and John M.

353  Harris, whose typeset names appear on five (5) Orders issued across the 5th DCA that

354  repeatedly deny Baylor of the same relief liberally seen accorded to Whites.

355

> Harris from this appeal, including all related matters or proceedings, pursuant
> to Canon 2(A)[1], 3(E)(1)[2] and 3(B)(8)[3] of the Florida Code of Judicial Conduct. As
> grounds for this motion, states as follows:
>
> _____
> [1] A judge shall respect and comply with the law and shall act at all times in a manner that
> promotes public confidence in the integrity and impartiality of the judiciary. Canon 2(A).
> [2] A judge shall disqualify himself or herself in a proceeding in which the judge's impartiality
> might reasonably be questioned. Canon 3(E)(1).
> [3] A judge shall dispose of all judicial matters promptly, efficiently, and fairly. Canon 3(B)(8).
>
> 1

356  46.  Following the same legal standard, the forefront of Baylor's Motion differs

357    no more than that of any White attorney, and contained a legal basis for disqualification.

358          47.    Despite a show of authority with argument to boot, on August 11, 2021, his

359    first set of Motion(s) to Disqualify were denied as "legally insufficient", shown below:

> DATE:  August 11, 2021
>
> **BY ORDER OF THE COURT:**
>
>     ORDERED that Appellant "Baylor's Verified Motion for Recusal or Disqualification of Appellate Judges for the Florida Fifth District Court of Appeals [sic]," filed August 4, 2021, is denied as legally insufficient.
>
> *I hereby certify that the foregoing is*
> *(a true copy of) the original Court order.*
>
> 
>
> SANDRA B. WILLIAMS, CLERK

360

361          48.    Retaliatory in nature, both Orders that deny Baylor's Motions to Disqualify,

362    fall on the exact date as the Order denying his First appeal as "moot," shown below:

> DATE:  August 11, 2021
> **BY ORDER OF THE COURT:**
>
>     Upon consideration of Appellant's Response, filed August 2, 2021, to this Court's July 23, 2021, Order to Show Cause, it is
>
>     ORDERED that the above-styled cause is hereby dismissed as moot.
>
> *I hereby certify that the foregoing is*
> *(a true copy of) the original Court order.*
>
> 
>
> SANDRA B. WILLIAMS, CLERK

363

364        In light of the aforementioned, Baylor filed a second Motion and affidavit on

365   November 28, 2021 at 11:24PM, to Disqualify the same Defendants under a different set

366   of grounds; including the instance where relief requested by Baylor aligned with the

367   Order denying his Motion opposing continuance; his First appeal denied as moot though

368   the court had power and authority to issue relief against the future enforcement against

369   fair housing rights; the late submission and acceptance of brief by a White party's White

370   attorney without leave by the court; and erroneous denial of recent Motions to Disqualify

371   alleged as legally insufficient when no justified reason other than basis could apply.

372        49.   Like Baylor's subsequent Motion to Disqualify, it contained legal grounds

373   for disqualification at all levels which did not touch on the legal standard found in 38.10,

374   Fla. Stat. or 2.330, Fla. R. Jud. Admin, which applies to trial court judges only. Rather,

375   the standard below sets itself apart from the standards above. For example:

> and John M. Harris, for the repeated deprivation of Civil Rights, Due Process, and Equal Protection under U.S. Const. amend. XIV, § 1; Fla. const. art. I § 2[1], 9[2] & 21[3], including; Canon(s) 2(A)[4], 3(E)(1)[5] and 3(B)(8)[6], of the Judicial Code of Conduct (noting impartiality and fairness).
>
> ---
>
> [1]"All natural persons, female and male alike, are equal before the law." Fla. Const. Art.1, §2.
> [2]"No person shall be deprived of life, liberty or property without due process of law." Fla. Const. Art.1, §9.
> [3]"The courts shall be open to every person for redress of any injury, and justice shall be administered without sale, denial or delay." Fla. Const. Art.1, §21.
> [4]"A judge shall respect and comply with the law and shall act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary." Canon 2(A).
> [5]"A judge shall disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned." Canon 3(E)(1).
> [6]"A judge shall dispose of all judicial matters promptly, efficiently, and fairly." Canon 3(B)(8).
>
> 1

376

377        50.   While the only case touching on the denial of disqualification in a Florida

378   District Court is found in the case of In re Estate of Carlton, 378 So. 2d 1212, 1216- 32

379    17 (Fla. 1979)(considered disqualification of Justice under Canon 3C(1)). Baylor's

380    second Motion for disqualification was also deemed "legally insufficient," and once

381    more a biased Order was entered against him on December 15, 2021, as shown below.



DATE:  December 15, 2021

**BY ORDER OF THE COURT:**

ORDERED that Appellant's Motion to Disqualify, filed November 28, 2021, is denied as to Judges Lambert, Wallis, Edwards and Harris and denied as legally insufficient as to Judges Eisnaugle, Sasso, Traver, Nardella and Wozniak.

*I hereby certify that the foregoing is*
*(a true copy of) the original Court order.*

*Sandra B. Williams*

SANDRA B. WILLIAMS, CLERK

382

383                    4)    <u>Conclusive Outcome of One of Sixty Constitutional Violations</u>

384    51.    While stated in length in order to establish a basis for the gravamen of the

385    primary issue here, which is, the Orders shown above denying Baylor of disqualification

386    of the named Defendants, is paramount to the reason Baylor last received Notice in any

387    case filed in the 5th DCA, and establishes the fact that Baylor has been retaliated against

388    for no justified reason other than on the basis of his skin color, race, creed or ethnicity.

389    52.    In every appellate case following the last Order of denial entered December

390    15, 2021, not once has Baylor received any Notice in relation to the disposition of his

391    appellate cases. In addition, since that time, a final decision was entered against Baylor

392    in his Second Appeal on or about August 2022, which he has yet to receive Notice.

393        53.   Baylor was forced to discover that his Second appeal ended after the White

394    attorney for the White party filed a Motion for appellate attorney fees in the suit below

395    on August 3, 2022.

396        54.   In response to the vehement and intentional refusal to issue Baylor a copy

397    of a final opinion, on the same day, August 3, 2022, Baylor mailed a formal letter to the

398    5th DCA pursuant to Florida Statute § 35.15, which provides that "said clerk shall at all

399    times be required to furnish to any person who may desire the same certified copies of

400    such opinions and decisions." The statute covers the process for decisions to be filed;

401    and copies to be furnished, in the District Court of Appeal, under Title V, Chapter 35,

402    Section 15, of the Florida Statutes.

403        55.   At no time thereafter has Baylor's request for a copy of the 5th DCA's final

404    opinion, has been provided so that he may exercise the right to petition for rehearing,

405    clarification, certification, or issuance of a written opinion . . within 15 days of an order

406    or decision of the court, pursuant to Fla. R. App. P. 9.330(a)(1).

407        56.   Based on the foregoing, there can be no doubt that the minimum procedural

408    Due Process requirements, Notice and opportunity to be heard, is inappropriately denied

409    on the count of bias, whether miniscule or abundant. Because Baylor is not White, he is

410    denied of the traditional Due Process of Notice guarantee that is squarely seen afforded

411    to Whites only, even to the simple right to a copy of a final opinion required to be issued

412    by law, not applicable to Baylor, who is a Black unrepresented litigant.

413        c)  <u>Supreme Bias at the Highest Level of Injustice</u>

414        57.   Due to the fact Baylor has not been issued a copy of the 5th DCA's final

415   opinion after making a formal request provided for by law, on August 15, 2022 at 6:22

416   AM, Baylor filed a petition for Writ of Mandamus in the Florida State Supreme Court to

417   compel the 5th DCA to issue to him a copy of its final opinion, as required by law.

418       58.   Like in all other pleadings, Baylor's petition provides a legal basis for the

419   granting of such relief, and squarely asserts slightly further from the intro above it, other

420   reasons for the primary basis why relief should be granted, as seen below:

> ~~of Appeal, 662 So. 2d 1888 (Fla. 1998).~~
>
> ### NATURE OF THE RELIEF SOUGHT
>
> Expedited relief from this Court is required due to the thirty (30)
> day pendency of the deadline for filing for discretionary review in this
> Court, set by Rule 9.120 of the Florida Appellate Procedure. Without
> emergency relief, Petitioner cannot append to his petition, a conformed
> copy of the opinion of the district court of appeal for review, because no
> copy was sent to him electronically or via U.S. mail at the conclusion of
> the appeal, or upon formal request.
>
> ~~Once more, Petitioner is subjugated to the deprivation and denial~~

421

422       59.   Baylor's petition even provides clarification of ambiguous language found

423   in Florida's State's Statute, supported by decisions made in federal court, as seen below:

> According to Florida Statute § 35.22(4), "[c]opies of opinions,
> orders, and decrees shall be furnished in all cases to each attorney of
> record." While the statute only mentions service upon attorneys, Florida
> courts have long held that, "the term 'counsel'. . includes *pro se* litigants
> acting as their own counsel, KMG Int'l, BV v. Fun Light Amusements,
> ~~Case No. 8:19-cv-333-T-02SPF (M.D. Fla. Oct. 24, 2019); Nichols Brosch~~

424

425  60.   In addition, Baylor provides relevant guidance using the court's own case

426  precedent consistently upheld, in order to steer the court towards the rendering of what it

427  constitutes as constitutional relief, as seen below:

> ~~executing or exercising alternate remedies.~~
>
> On the other hand, this Court issued mandamus relief when the District Court did not comply with the Rule, in State ex. rel. Price v. McCord, 380 So.2d 1037, 1039 (Fla.1980)(granting writ of mandamus and concluding that rule 9.340 created a ministerial duty under specific circumstances). Even so, it appears that the Rule is equally unavailing
>
> ~~in regards to Due Process of Notice to unrepresented parties, since Fla~~

428

429  61.   Despite falling into the same category of right to Notice given to Whites,

430  Baylor's case was dismissed August 16, 2022, by a mere clerk who erroneously alleged

431  that Baylor was seeking review of a final district court decision, as seen below:

> This case is hereby dismissed. This Court's jurisdiction to issue extraordinary writs may not be used to seek review of an unelaborated decision from a district court of appeal that is issued without opinion or explanation or that merely cites to an authority that is not a case pending review in, or reversed or quashed by, this Court. See Foley v. State, 969 So. 2d 283 (Fla. 2007); Persaud v. State, 838 So. 2d 529 (Fla. 2003); Stallworth v. Moore, 827 So. 2d 974 (Fla. 2002); Grate v. State, 750 So. 2d 625 (Fla. 1999).
>
> No motion for rehearing or reinstatement will be entertained by the Court.
>
> A True Copy
> Test:
>
> John A. Tomasino
> Clerk, Supreme Court

432

433    62.    While it would be onerous to list every action taken against Defendants to

434    compel or quell the deprivation of fundamental rights, it should first be noted that Baylor

435    sought relief in numerous ways and in cases at every level in Florida courts, including,

436    against the Defendant above, specifically John A. Tomasino, who repeatedly dismissed

437    Baylor's cases under color-of-law to hide discriminatory intent, perpetuated into present

438    day bias which manifested itself by dismissal, alleging something that never occurred.

439    63.    Prior to dismissal of the above-case, Baylor sought relief against Tomasino

440    on August 1, 2022, by filing a Complaint in the Florida Middle District Court.

441    64.    As a result of complaining in federal court, Tomasino later vacated its own

442    biased decision August 16, 2022, but to evade the appearance of discrimination, then

443    alleged that Baylor's petition somehow fell short of the court's expectations, two entirely

444    separate and distinct excuses for biased dismissal, as shown below:

> The order of this Court dated August 16, 2022, dismissing the above case is hereby vacated.
>
> The petition for writ of mandamus, which was filed with this Court on August 15, 2022, does not comply with Florida Rule of Appellate Procedure 9.100 and is hereby stricken. Petitioner is directed, on or before October 10, 2022, to file a proper petition which is submitted in either Arial 14-point font or Bookman Old Style 14-point font and include a Certificate of Compliance that immediately follows the Certificate of Service.
>
> The failure to file a proper petition with this Court within the time provided could result in the imposition of sanctions, including dismissal of this case.  *See* Fla. R. App. P. 9.410.
>
> A True Copy
> Test:
>
>
> John A. Tomasino
> Clerk, Supreme Court

445

446        65.   On October 10, 2022 at 11:59PM, in the Florida supreme court, Baylor re-

447    filed his petition for mandamus relief to compel the 5th DCA to issue to him a copy of

448    its final decision entered on or about August 2022.

449        66.   Whether or not Baylor complied with the Rules of the court (unlike White

450    attorneys who file late briefs without respect for court Rules), on December 15, 2022,

451    Tomasino, deciding through Mark Clayton, another clerk, denied Baylor's mandamus

452    petition on the basis that no clear legal right was shown, as seen below:

> Because petitioner has failed to show a clear legal right to the relief requested, he is not entitled to mandamus relief. Accordingly, the petition for writ of mandamus is hereby denied. *See Huffman v. State*, 813 So. 2d 10, 11 (Fla. 2000). No rehearing will be entertained by this Court.
>
> CANADY, POLSTON, LABARGA, COURIEL, and GROSSHANS, JJ., concur.
>
> A True Copy
> Test:
>
> Mark Clayton, Chief Deputy Clerk.

453

454        67.   Clearly on its face, Tomasino's decision is wholly biased when Baylor's

455    petition also asserts that, "a petitioner is entitled to mandamus relief where district court

456    of appeal failed to comply with an 'indisputable legal duty' under the Rule." Gabriele v.

457    State, 99 So. 3d 943 (Fla. 2012). Furthermore, the Rule-of-law provides for such relief,

458    especially when the Rule itself states that "a copy of all orders and decisions shall be

459    transmitted in the manner set forth for service in rule 9.420(c), by the clerk of the court

460    to all parties at the time of entry of the order or decision."

68.   Baylor's petition for mandamus, and the law of the State, clearly show that he has a clear legal right and is entitled to relief, but because Baylor is Black, he has shown that he will never under any circumstance, even when his legal documents are precisely in line with the decisions of court and laws of Whites, be granted any equitable or lawful relief, remedy or redress commonly reserved for Whites only.

69.   It should be further noted that prior to the decision above, on June 22, 2022 at 11:49PM, in the Florida supreme court, Baylor filed a petition for "Emergency Relief En Banc Directed to Charles T. Canady," as shown below:



EMERGENCY PETITION FOR RELIEF EN BANC DIRECTED TO
the Honorable Chief Justice Charles Terrance Canady
(MANDATORY JURISDICTION)

Christopher Gary Baylor
Florida No. 4979316

70.   At the time of filing, Canady was believed to be chief justice for the Florida supreme court, until Baylor later discovered it no longer held the position. Baylor had also later discovered in a news article written by the *South Florida Sun Sentinel*, that Canady was accustomed to making biased decisions and would not be capable of issuing fair or unbiased decisions relating to relief given to Blacks, when Canady was the issuer of an Order barring courses insisting on Fairness and Diversity Training in the State of Florida, which focuses on unconscious biases affecting people in various ways.

477       71.    The article that describes one or more attendees who took offense and who

478   complained to Canady, were met with equal or greater offense when Canady responded

479   by stating:

480           "*I reject the notion that our system of justice is systematically racist*
481           *or systematically unjust in any way. Our system certainly does not*
482           *always work perfectly, but the assertion that it is systematically*
483           *unjust does not fairly describe the work that Florida judges do day*
484           *in and day out ... And we can work to improve the system without*
485           *condemning it as fundamentally flawed.*"

486       72.    But the same way Canady took offense to the mere suggestion of racism in

487   Florida courts, was it later duplicated and proven to the same degree when Baylor had

488   suggested that racism existed in all of his cases, which was then seemingly responded by

489   Canady spearheading support to deny Baylor's earlier petition for "Emergency Relief En

490   Banc Directed to Charles T. Canady," denied October 26, 2022 at 11:29AM, as shown

491   below:

> Petitioner has filed a petition for writ of prohibition with the Court. To the extent Petitioner seeks to disqualify various judges of the Fifth District Court of Appeal, the petition is denied. To the extent Petitioner seeks to disqualify Judge Jacobus, the petition is denied as successive. *Cf. Jenkins v. Wainwright*, 32 So. 2d 477, 478 (Fla. 1975). Any motions or other requests for relief are denied. No rehearing will be entertained by this Court.
>
> CANADY, POLSTON, LABARGA, COURIEL, and GROSSHANS, JJ., concur.
>
> A True Copy
> Test:
>
> Mark Clayton, Chief Deputy Clerk,
> for John A. Tomasino

492

493       73.    Once again, Baylor's pleadings clearly show legal grounds that there is

494   authority under law to warrant relief, even under uncommonly used legal principles not

495   generally argued by attorneys, but are nonetheless legally valid reasons to assure Baylor

496   is likewise, entitled to the same rights as Whites, as shown below:

This classification of rights is clearly not arbitrary or without merit, as it has been steadfastly maintained that matters relating to the practice of law, including the admission of practitioners and their discipline, are within the inherent and exclusive power of the Supreme Court of Florida, and this Court has declared that conduct of judges are matters solely within the province of this Courts' "exclusive jurisdiction to. . . discipline [] persons admitted. Fla. const. Art. V, § 15." In re The Florida Bar — Code of Judicial Conduct, 281 So.2d 21 (Fla. 1973). This organic law embodied within the State's constitution runs within the territorial jurisdiction of this State for more than several decades.

Further evidence of this Court's exercise of control over the discipline of its judges was previously determined that misconduct in a judgeship. . is consequently a proper ground for discipline. Florida Bar v. McCain, 330 So.2d 712 (Fla.

497   1976)("a judge is a lawyer whose labors are performed behind the bench instead of

In addition, "anomalous jurisdiction is an equitable doctrine which allows a [chief judge] to exercise jurisdiction based on its inherent authority over officers of the court." Hunsucker v. Phinney, 497 F.2d 29, 32 (5th Cir. 1974) cert. denied, 420 U.S. 927, 95 S .Ct. 1124, 43 L.Ed.2d 397 (1975); See also Bundy v. Rudd, 366 So. 2d 440 (Fla. 1978)(granting petition where circuit court erroneously denied motion to recuse judge).

In the alternate, this Court has jurisdiction under the collateral order doctrine see Digital Equipment Corp. v. Desktop Direct, Inc., 114 S. Ct. 1992, 1995 (1994).

498   Under this theory. Mr. Baylor's case and circumstance satisfies the test set by the

499      74.   However, as stated earlier in this Complaint, racism is inherent and freely

500    adopted by and through other Whites, which is pervasive in nature, since it is widely

501    promoted through a large number of platforms in America, including news articles.



Despite statistics that say otherwise, Florida Supreme Court Chief Justice Charles T. Canady, seen here in a 2015 file photo, maintains systemic racism does not exist in the Florida judicial system. (Steve Cannon/AP )

502

503    75.    Canady's offensive behavior is quite adopted and akin to Justice Alito's.



US News

Supreme Court: Justice Alito's fight to defend white racial innocence

504

76.   Clearly, Canady is influenced by the alluring idea of White supremacy, which cultivates the basis for racism and its biased decisions when no other decision can or will ever be made in favor of any Blacks, such as Baylor, when American laws are obviously designed to apply to Whites only.

77.   Based on the aforementioned, it can clearly be shown that at every level of the State courts, decisions are made based on racism or discrimination instead of any palpable reason found under law, and that there can be no relief obtained at any time or in any given circumstance because Baylor is Black. Therefore to maintain the *status quo* or at least give the god damn illusion of justice, injunctive relief should be issued against the continued contrariness of law clearly found to be applicable to Whites in a number of cases decided by the State.

d)   Lack of Notice Adversely Affects One Party's Interest Without Proper Notice

78.   Without a copy of the 5th DCA's final opinion, or granting of the right to such relief, Baylor cannot ascertain upon any specific grounds, the manner in which he could raise a request for rehearing, clarification or for written opinion pursuant to Fla. R. App. P. 9.330(a), to determine whether his right to stay at the property mentioned herein was ever even considered.

79.   Baylor remains prejudiced substantially, and irreparably harmed by being denied the right to adequately, effectively or meaningfully receive final opinions and Notices in his cases, which have a limited time to challenge.

1)   No News is Not Good News Absent Notice After Appeal

80.   On August 18, 2022 at 10:37PM, in an independent State court action,

527    Baylor timely[2] filed Notice to appeal a non-final Order entered July 19, 2022 at 2:26PM,

528    denying a Motion to Disqualify, filed July 18, 2022 at 10:25AM, as shown below:

> _____
> Defendants.                    /
>
> ### NOTICE OF APPEAL
>
>     Pursuant to Florida Rules of Appellate Procedure 9.130(a)(3)(E), Notice is hereby given that Plaintiff, Christopher Gary Baylor, appeals to the Fifth District Court of Appeal for the Eighteenth Judicial Circuit from an Order entered July 19, 2022 (Dkt. No. 44), denying Plaintiff's Motion to Disqualify /Recuse. A conformed copy of the order is attached hereto.
>
>     August 18 2022                     /s/Christopher Gary Baylor

529

530        81.   On February 12, 2023 at 10:59PM, in a different State court suit, Baylor

531    timely filed Notice to appeal an Order entered on January 17, 2023 at 9:15PM, denying

532    Motion for Rehearing filed November 15, 2022 at 4:42AM, as shown below:

> ### NOTICE OF APPEAL
>
>     Pursuant to Florida Rules of Appellate Procedure 9.110, Notice is hereby given that the Defendant/Appellant, Christopher Gary Baylor, appeals to the Fifth District Court of Appeal for the Eighteenth Circuit from the Final Order entered on January 17, 2023 (Dkt. No. 64) for attorney fees, as well as any judgments, opinions, rulings or orders subsumed therein. A conformed copy of the orders are attached hereto.
>
>     Submitted this 12th Day of February 2023
>
>                         /s/ Christopher Gary Baylor

533

534        82.   As firmly asserted earlier in this Complaint, _Ibid_ at 382, since on or about

535    December 15, 2021, following submission of Baylor's Motions to Disqualify Brian D.

---

[2] "The following rules apply in computing time periods specified in any rule of procedure, local rule, court order, or statute that does not specify a method of computing time. . . begin counting from the next day that is not a Saturday, Sunday, or legal holiday" Fla. R. Gen. Prac. Jud. Admin. 2.514(a)(1)(A).

536  Lambert, F. Rand Wallis, James A. Edwards, Eric J. Eisnaugle, John M. Harris, those

537  Defendants and other members of the Florida 5th DCA, including Sandra B. Williams,

538  together have refused to provide Baylor with any Notice with respect to the disposition

539  of his appellate cases that are pending, or newly filed with that court.

540  83.   While these issues have been raised before the Florida supreme court,

541  Charles T. Canady, Ricky Polston, Jamie R. Grosshans, Jorge Labarga and John D.

542  Couriel, including Johan A. Tomasino and Mark Clayton, have refused to issue relief in

543  connection or regards to the biased and retaliatory conduct against Baylor because he is

544  Black. State court precedent has said in legal context that, "this court has "recognized the

545  importance of the constitutional guarantee of citizen access to the courts, with or without

546  an attorney." In re Eriksson, 36 So.3d 580, 596 (Fla.2010)(ordering a public reprimand

547  where the judge was found to have retaliated against the defendant for filing a motion to

548  disqualify).

549  84.   But it is apparent that Baylor has no constitutional rights that any Whites

550  are bound to recognize or respect, because the constitutions were never made to apply to

551  non-Whites in the first place. In either case, Baylor is forbidden from receiving Notice in

552  his appellate cases without just cause, other than the fact that he is Black.

553  85.   It is important to note that Baylor has never been deemed by any court that

554  he is a litigant that has repeatedly filed meritless, frivolous, abusive pleadings that are

555  inappropriate for review or has otherwise abused the process of the court. Neither has

556  Baylor ever been asked or failed to show-cause based on the issuance of an opinion

557  sanctioning him. Baylor has never been sanctioned as defined under any Rule of law,

558   or Florida Statute, and no court has ever found that his proceedings are frivolous or

559   malicious or otherwise met those requirements of any law, as seen below:

| Florida Supreme Court Vexatious Litigants List - Updated 03-14-2023 | | | |
|---|---|---|---|
| **NAME** | **DATE** | **CIRCUIT** | **COUNTY** |
| ARDIS, Robert Michael | 5/26/2017 | 1 | Escambia |
| ARDIS, Robert Michael | 3/9/2021 | 2 | Leon |
| ARMSTEAD, Brenda C. | 2/4/2005 | 20 | Collier |
| BEAVER, Steven Earl | 11/8/2006 | 2 | Leon |
| BERMUDEZ, Felix | 4/12/2017 | 4 | Clay |
| BERMUDEZ, Felix | 4/12/2017 | 4 | Duval |
| BERMUDEZ, Felix | 4/12/2017 | 4 | Nassau |
| BLACK, Timothy | 7/20/2006 | 2 | Leon |
| BREWER, Gaye Lynn Dilek | 12/3/2017 | 1 | Escambia |
| BREWER, Gaye Lynn Dilek | 2/13/2018 | 1 | Escambia |
| BROWN, Devon A. | 6/12/2020 | 11 | Miami-Dade |
| BRYAN, T. Terell | 4/30/2013 | 4 | Duval |
| BUEHLER, Sally L. | 9/10/2009 | 16 | Monroe |
| CABANZO, Martha Licia Duque | 7/18/2022 | 20 | Charlotte |
| CARY, III, Walter H. | 9/16/2019 | 4 | Clay |
| CASEY, Brian M. | 4/18/2022 | 2 | Leon |
| CLARK, Joseph | 2/13/2020 | 1 | Escambia |
| COCORES M.D., James A. | 11/13/2019 | 15 | Palm Beach |
| COPELAND, Shannon | 3/2/2018 | 5 | Marion |
| CRUZ, Nidia | 12/22/2020 | 4 | Clay |
| CRUZ, Nidia | 12/22/2020 | 4 | Duval |
| CRUZ, Nidia | 12/22/2020 | 4 | Nassau |
| DAY-PETRANO, Mary Katherine | 5/4/2017 | 8 | Alachua |
| DORSEY SR., Hencile | 2/2/2016 | 11 | Miami-Dade |
| FEDE, Henry | 11/9/2017 | 17 | Broward |
| FEDE, Helene | 11/9/2017 | 17 | Broward |
| FEDE, Jean | 11/9/2017 | 17 | Broward |
| FLOURNOY, Larvictor | 5/15/2006 | 2 | Leon |
| FOREST, Hopal Charmaine | 1/19/2022 | 19 | St. Lucie |
| FRANCIS, Youkoma | 12/2/2008 | 17 | Broward |
| FRAZIER, Kelvin | 1/16/2007 | 2 | Leon |
| FREDERICK, John Henry | 12/30/2015 | 9 | Orange |
| FULLER, Kenneth L. | 11/1/2022 | 1 | Escambia |
| FULLER, Kenneth L. | 11/1/2022 | 1 | Okaloosa |
| FULLER, Kenneth L. | 11/1/2022 | 1 | Santa Rosa |
| FULLER, Kenneth L. | 11/1/2022 | 1 | Walton |
| GAINEY, Yolanda | 11/12/2014 | 7 | Volusia |
| GONZALEZ, Ada A. | 8/5/2020 | 2 | Leon |
| GREEN, Stephen S. | 3/29/2008 | 20 | Collier |
| GREEN, Stephen S. | 4/27/2010 | 20 | Hendry |
| HALL, Wendall | 9/16/2015 | 7 | Volusia |

560

561        86.    Absent any justified legal reason, Baylor is simply denied of the right to

562    Notice, not based on law, but rather invidious discrimination against him. Moreover,

563    no other Notice has been provided to him, even when the Rules of law explicitly call

564    for it, as clearly shown below:

> **FIFTH DISTRICT COURT OF APPEAL, STATE OF FLORIDA**
> 300 South Beach Street, Daytona Beach, FL  32114
> January 8, 2019
>
> **Administrative Order AO5D19-01**
> **In re: Electronic Filing via Statewide Portal**
>
> WHEREAS the Supreme Court of Florida has, in Administrative Order AOSC18-74, required that all filings made to the Fifth District Court of Appeal be submitted electronically via the Florida Courts E-Filing Portal (the "statewide portal"), except when a paper filing is authorized, and has further required that such electronic submissions via the statewide portal "shall comply with all relevant Florida Rules of Appellate Procedure, Florida Rules of Judicial Administration, and Florida Supreme Court Standards for Electronic Access to the Courts"; and
>
> WHEREAS the Supreme Court of Florida has, in Administrative Order AOSC 18-74, expressly provided that the Fifth District Court of Appeal will continue to use the eDCA system to serve all "acknowledgment letters, orders, opinions, mandates, and other outgoing filings on electronic filers through a link provided by eDCA Casemail," it is ORDERED that:
>
> 1) Effective January 10, 2019, all filings submitted to the Fifth District Court of

565

566        87.    It has also been said elsewhere, as shown below:

> **DO NOT MISS RECEIVING IMPORTANT COURT DOCUMENTS, NOTICES, AND ORDERS IN THIS CASE**
>
> To register with eDCA, attorneys must visit the Court's website, www.5dca.org, and click on the "eDCA" link at the top of the page.  That link will take users to a log-in page that instructs unregistered users how to register.  Registrations are processed during regular business hours.
>
> Pro se filers are permitted, but not required, to register with eDCA.  Pro se filers who register with eDCA will receive electronic Casemail only—no paper copies of court-issued documents will be mailed to them.
>
> Law firms are advised that they must designate a registered attorney of record to receive Casemail.
>
> *Joanne P. Simmons*
> Joanne P. Simmons, Clerk of Court
> Fifth District Court of Appeal

567

568    88.    In addition, "[a]ll documents required or permitted to be served on another

569    party must be served by e-mail." Fla. R. Gen. Prac. Jud. Admin. 2.516(b)(1). Therefore,

570    based on the foregoing, Baylor is entitled to declaratory relief stating precisely what his

571    rights are as a non-White litigant in the State of Florida, and injunctive relief against the

572    specified Klan members who continue to act contrary to laws that fail not specify if or

573    when Notice should not be given based on race, creed or ethnicity, but rather should be

574    given to "attorneys" and "*pro se* litigants".

575    B. Bias Befitting Barring of Baseline Behavior in the Beginning

576    a)   The Second Act in a Series of Acts That Examine the Limited State of Access
577         to Impartial Judges

578    89.    Stemming from a different suit commenced December 20, 2021 at 2:26AM,

579    Baylor directly filed a petition for Writ of Prohibition in the Florida supreme court on

580    May 10, 2022 at 3:20AM, from an Order issued on May 9, 2022 at 11:19PM denying a

581    legally sufficient Verified Motion with affidavit filed on May 8, 2022 at 11:53PM, to

582    disqualify Curtis Jacobus.

583    90.    After Baylor filed his petition with in the Florida supreme court on May 10,

584    2022, the next day on May 11, 2022 at 1:49PM, Tomasino administratively transferred

585    Baylor's petition for Writ of Prohibition to the 5th DCA, in a court where Baylor had

586    already complained was biased, and that had already refused and continues to refuse to

587    provide Baylor with any Notice in his cases as required by law, which began on or about

588    December 15, 2021, and continues to date.

589    91.    As expected upon transfer of Baylor's petition, the 5th DCA failed to give

590    Baylor any further Notice regarding acceptance, acknowledgment, docketing or status of

591    his case once transferred from the Florida supreme court.

592         92.   Because similar conduct in the State court action commenced December

593    2021 warranted further disqualification action, on July 11, 2022 at 11:18AM, Baylor

594    filed a second Verified Motion with affidavit to once more disqualify Jacobus, which

595    was expectedly denied on July 13, 2022 at 12:55PM as legally insufficient.

596         93.   Before continuing, it must first be noted that Baylor's Motions, like others,

597    are well-drafted and meet the State's criteria for disqualification of an impartial or biased

598    judge. For example, Baylor's Motion contains a lawful basis for the relief requested, as

599    seen below:

600

> **PLAINTIFF'S VERIFIED MOTION TO DISQUALIFY**
> **JUDGE CURTIS JACOBUS**
>
> Native African American male Plaintiff, Christopher Gary Baylor ("Baylor"), pursuant
> to §38.10 Florida Statutes and Florida Rules of Judicial Administration 2.330, moves to
> disqualify Judge CURTIS JACOBUS ("JACOBUS") as Judge in this action, because Baylor
> fears he will not receive a fair hearing on account of a specifically described bias or prejudice
> of Judge JACOBUS against him and states as follows:
>
> **STATEMENT OF FACTS**
>
> 1. Plaintiff, Baylor, has a well-rounded fear that he will not receive a fair hearing of fair
> consideration of his arguments in front of Judge JACOBUS.   .
>
> 2. That Baylor is an unrepresented indigent Native African American male.

601         94.   In addition, Baylor's Motion for disqualification clearly asserts enumerated

602    grounds that warrant the issuance of an Order of disqualification that should be granted

603    based on documentary evidence and specified salient facts that are indisputable. For

604    example:

> 7. That a Motion to vacate was filed on June 29, 2022 under F.R.C.P. 1.540(b).
>
> 8. That this court retains jurisdiction to decide post judgment Motions.
>
> 9. That upon entry of an Order dismissing this case without hearing or Notice on June 20, 2022, and declining to vacate the same Order within the time specified by a Motion to vacate filed on June 29, 2022, Judge JACOBUS did the following:
>
>     a. Prejudged the facts of this case before hearing any evidence.
>
>     b. Admitted to violating the constitutional right to Due Process regarding Baylor.
>
>     c. Abandoned its mantle of impartiality by showing sympathy and becoming an advocate for the Defendant against Baylor in this case arguing both the facts and the law in the place of the Defendant.
>
>     d. Declined to vacate a final judgment violating Due Process regarding Baylor.
>
>     e. Admitted that it challenged personal jurisdiction while the Defendant did not challenge personal jurisdiction, *See* **Exhibit "A"** at ¶ C.
>
>     f. Admitted that it challenged the statute of limitations while the Defendant did not challenge the statute of limitation, *See* **Exhibit "A"** at ¶ K.
>
>     g. Impugned the veracity of the merits of Baylor's Complaint without a hearing or trial.
>
> 10. That based on this court's previous dealings with the undersigned, as well as
>
> 2

605

606    95.    Although not generally required, Baylor's Motion for disqualification also

607    voluntarily rules out any doubts of untimeliness, as shown below:

> **i. Time**
>
> 1. Fla. R. Jud. P. 2.330(g) provides in relevant part, "[a] motion to disqualify shall be filed within a reasonable time not to exceed 20 days after discovery by the party. . . , whichever is earlier, of the facts constituting the grounds for the motion."

608

609

> 2. This Motion is timely filed according to Fla. R. Jud. Admin. 2.514(a)(1), since it is filed within a reasonable time proscribed by the Rule(s) and does not to exceed 20 days after discovery, which first occurred on June 20, 2022 and, subsequently on July 5, 2022. This court has no discretion in denying a legally sufficient Motion.

610    96.    In furtherance of providing a legal basis for the issuance of relief, Baylor's

611   Motion for disqualification is supported by a memorandum of law which begins with the

612   law of Florida State which is commonly cited by White attorneys in many cases for the

613   disqualification of a judge, as seen below:

> ### MEMORANDUM IN SUPPORT OF MOTION
>
> **I.    PROCEDURE**
>
> Section 38.10, Florida Statutes, gives substantive right to disqualify a trial judge. However, the actual process of disqualification is procedural. Generally, Fla. R. Jud. P. 2.330 controls the disqualification process. Livingston v. State, 441 So. 2d 1083, 1087 (Fla. 1983).
>
> Fla. R. Jud. P. 2.330(b) provides that, "[a]ny party. . . may move to disqualify the judge assigned to the case on grounds provided by rule, statute, Code of Judicial Conduct, or general law, and in accordance with the procedural provisions of this rule."

614

615    97.    According to the State of Florida, a motion to disqualify is legally sufficient

616   if the facts alleged, assumed to be true, would cause a reasonable person to have a well

617   founded fear that he will not receive a fair trial from the assigned judge. The subjective

618   fear of a party seeking the disqualification of a judge is not sufficient. Rather, the facts

619   and reasons given for the disqualification of a judge must tend to show personal bias or

620   prejudice, such as the case here.

621    98.    Baylor's Motion clearly alludes to the fact that JACOBUS actively played a
622    role in supporting the other party in his case by raising defenses and arguments never
623    raised by either party, which is a clear basis for disqualification well supported by many
624    courts, including the State of Florida, as seen below. For example.

> propriety should cause *sua sponte* disqualification. The Supreme Court has consistently
> held that "[j]udges are required to follow the law and apply it fairly and objectively to all
> who appear before them. No judge is permitted to substitute his concept of what the law
> ought to be for what the law actually is." In re Eriksson at 589. In essence, "the effect of
> the trial judge's actions was to relieve [Defendant] of her burden of proof and to help her
> prove the essential elements of the case." R.S. v. C.P.T., 333 So. 3d 1190 (Fla. 5th DCA
> 2022). "In these ways, the trial court [r]egrettably . . . abandoned his post as a neutral
> overseer of the dispute between the parties; A trial judge crosses the line when he
> becomes an active participant in the adversarial process." Bank of Am. v. Atkin, 303 So.
> 3d 583 (Fla. 3rd DCA 2018).

625

626    99.    Courts have also said elsewhere:

> 5.    Along with decisions from other circuits, contains both a persuasive rationale and
> precedential value in terms of supporting and determining whether the disqualification
> of a biased or prejudice judge is appropriate under these circumstances. Likewise, other
> courts have said, "courts are not free to play the role of advocate, and raise claims or
> defenses that should be left to the parties to raise." Doubleday Co., Inc v. Curtis, 763
> F.2d 495, 502 (2nd Cir. 1985), *cert*. denied, 474 U.S. 912 (1985)(court cannot raise the
> defense when it was not raised by the party who could have done so.) At this stage, the

627

628    100. Based on Statutes, common-law and salient facts supporting Baylor's
629    Motion, nothing else can be seen, other than sheer bias exhibited in the Orders of denial,

630 when Baylor's Motions are legally sufficient under the Rule and laws of the State. While

631 the requisite matter of verification and notarization is by no means mentioned in the

632 Statute or the Rules, Baylor's Motion meets all known and unknown requirements for a

633 legally sufficient Motion, as shown below:



634

635   101.  However, Baylor is denied of the same relief liberally seen given to Whites

636 because he is Black, this fact well known since Baylor's documents generally include his

637 race when the relief sought is on the basis of racial or ethnic bias. For this very reason,

638 Baylor is denied of the same relief afforded to Whites.

639   b) <u>How a Justice's Just Attempt to Make Rights Equal For One Is Also Denied</u>

640   102.  Due to the successive denial(s) of disqualification Motions, Baylor again

641 repeated the elevation of issues to authority beyond the 5th DCA, to the Florida supreme

642 court, where on July 25, 2022 at 3:02AM, Baylor filed a Writ of Prohibition directed to

643 Florida supreme court Chief Justice, CARLOS MUNIZ for review.

644   103.  While no public opinion was made in response to Baylor's petition for Writ

645    of Prohibition, on November 1, 2022, the Chief Justice for the supreme court of Florida

646    issued judicial Order 2023-17 and Order 2023-8 to transfer two of Baylor's cases from

647    the Florida supreme court to Florida's Second District Court of Appeal ("2nd DCA"), as

648    shown below:

raised that are collateral to said cause.  The JUDGES of the
SECOND DISTRICT COURT OF APPEAL, under and by virtue of the
authority hereof, are hereby vested with all and singular the powers
and prerogatives conferred by the Constitution and laws of the

Assignment Order 2023-17
November 1, 2022
Page Two

State of Florida upon a judge of the court to which the judges are
hereby assigned.
     DONE AND ORDERED at Tallahassee, Florida, on November
1, 2022.



CHIEF JUSTICE CARLOS G. MUÑIZ
SUPREME COURT OF FLORIDA
2023-17 11/01/2022

649

650       104. It should be noted as a reminder, that Baylor sought relief against the 5th

651    DCA in an independent action in the Florida State court. Given the fact that the case

652    against the 5th DCA is no longer entirely applicable since half of the Defendants were

653    transferred to what is now known as the Florida "Sixth District Court of Appeal", which

654   became effective on January 1, 2023, despite the transfer of some Defendants, claims

655   and issues asserted here remain at issue against Brian D. Lambert, F. Rand Wallis, James

656   A. Edwards, Eric J. Eisnaugle and John M. Harris, thus the second Order issued by Chief

657   Justice Muniz for the Florida supreme court is shown below:

raised that are collateral to said cause.  The JUDGES of the
SECOND DISTRICT COURT OF APPEAL, under and by virtue of the

Assignment Order 2023-8
September 15, 2022
Page Two

authority hereof, are hereby vested with all and singular the powers
and prerogatives conferred by the Constitution and laws of the
State of Florida upon a judge of the court to which the judges are
hereby assigned.

    DONE AND ORDERED at Tallahassee, Florida, on September
15, 2022.

CHIEF JUSTICE CARLOS G. MUÑIZ
SUPREME COURT OF FLORIDA
2023-8 09/15/2022

658

659   105. Prior to the issuance of both Orders, it should also be noted that in some

660   cases, due to the reason that the 5th DCA repeatedly refused to provide Baylor with

661   Notice — four (4) of the five (5) District Courts of Florida at the time, were included on

662   service of Baylor's court documents, including the 2nd DCA that was also made aware

663  of highly contested issues raised in Baylor's cases including suit against the Defendants

664  herein, which extended the realm of bias and retaliation beyond the 5th DCA.

665  106. Because, upon transfer of Baylor's cases to the 2nd DCA, the Defendants'

666  biased conduct was further evinced on January 13, 2023, when Kuenzel issued Notice

667  threatening dismissal of Baylor's case under of color-of-law, by alleging that Baylor's

668  timeless case was subject to the timeliness of the filing of a Notice of Appeal provision,

669  as shown below:

> **BY ORDER OF THE COURT:**
>
> On August 31, 2022, Petitioner filed a petition for writ of mandamus challenging the trial court's June 20, 2022, order dismissing Petitioner's complaint with prejudice, and the trial court's July 13, 2022, order denying Petitioner's motion to set aside the June 20, 2022, order. These orders are reviewable under Florida Rules of Appellate Procedure 9.110 and 9.130. However, to invoke this court's jurisdiction, a notice of appeal must be filed within thirty days of rendition of the order on appeal.
>
> Within 20 days from the date of this order, Petitioner shall show cause why this court should not treat the petition for writ of mandamus as a notice of appeal and dismiss it as untimely. All filings in this Fifth District Court of Appeal case shall be

670

671  107. Here lies a clear indication that despite the Order issued by the Florida

672  supreme court mandating that the 2nd DCA review Baylor's cases in lieu of the 5th

673  DCA, is founded strictly upon an existing bias against Baylor because he is Black, and

674  the fact that Whites, such as Kuenzel, Kelly, Sleet, Villanti and Suzanne, have no respect

675  for a Hispanic judge who issued the Order and unseated Canady, who is White, and was

676  the previous Florida supreme court Chief Justice.

677  108. Nonetheless, Baylor promptly responded to Kuenzel's Notice by filing a

678  complex and highly detailed response brief, while expounding upon the arguments made

679  in his petition by clarifying that the relief he requested was bound to be issued under the

680  court's own case precedent, shown in every pleading or legal document filed by Baylor,

681    such varied usage is shown below by summary at the beginning of Baylor's twenty-eight

682    (28) page response brief.

**Important Paras**

- This court would directly contravene the Court's Order, since the Order explicitly excludes this court from reviewing matters subsequently raised that are collateral to said cause. Because an appeal is an entirely separate matter and newly raised, this court would violate the Supreme Court's Order.

- If the Florida Supreme Court deemed the 2nd DCA worthy for appellate review, it would have Ordered so, for e.g.: McGee v. Crews, CASE NO.: SC13-2390 (Fla. Mar. 13, 2014).

- [T]he Rule which this court is insisting on invoking, specifically Fla. R. Civ. P. 1.630, applies to mandamus relief sought in circuit civil court, arising from quasi-judicial administrative review.

- Because circuit court judge CURTIS JACOBUS, for the first time, *sua sponte* raised new defenses that it lacked jurisdiction over Respondent, and subject-matter jurisdiction, mandamus lies if a court erroneously declines to accept or exercise jurisdiction. See Brown v. State, 613 So.2d 569, 570 n. 1 (Fla. 2d DCA 1993).

- [T]he Florida Supreme Court clerk did not initiate a new case under Petitioner's original writ until August 31, 2022, but was filed with the Florida Supreme Court on August 12, 2022. The filing date stated in the OSC is presumptive and not conclusive as to when the Supreme Court Clerk actually first received Petitioner's original writ, which may be rebutted by other evidence. Cook v. Walgreen Co., 399 So.2d 523, 524 (Fla. 2d DCA 1981).

- Conflating the original jurisdiction and appellate jurisdiction Rules would implicate the 30-day Rule generally applied to filing Notice of Appeals, imposing a time-based Rule on a provision not controlled by time. As relevant here, Rule 9.100 contains no specific time limit within which mandamus relief must be sought. Brown v. State, 885 So.2d 391 (Fla. 2nd DCA 2004).

- [C]ircuit court Judge JACOBUS in its final Order issued June 20 2022, *sua sponte* raised new defenses, lack of personal jurisdiction over Respondent. Judge JACOBUS summarily denied Petitioner's Rule 1.540(b)(4) Motion. "When the judge refuses to Rule on a motion challenging personal jurisdiction, it is appropriate to issue the writ. The trial judge's need to control his docket must become secondary when faced with a jurisdictional question." Berens v. Cobb, 539 So. 2d 24 (Fla. 2nd DCA 1989).

- The Orders are not appealable under Florida Rule of Appellate Procedure because they are Orders that determine the circuit court's subject matter jurisdiction. See Diasti v. Dep't of Revenue, 122 So.3d 492, 492 (Fla. 2d DCA 2013)

- Not only would enforcement of the erroneous OSC divest the trial court of its own jurisdiction over Petitioner's issues, but the district court's jurisdiction Petitioner requires to obtain mandamus review. "This court has already declined to grant mandamus relief because a Petitioner was in the process of appealing" Davis v. Twentieth Jud. Cir. Ct., 491 So. 2d 1232 (Fla. 2nd DCA 1986).

- T]he Supreme Court emphasized th[e] distinction, between court-made rules and statutory rules in Hamer v. Neighborhood Hous. Servs. of Chicago, 138 S. Ct. 13 (2017). The Court held that prescribed time limits found only in court-promulgated rules but not in an underlying statute are mandatory claim-processing rules and not jurisdictional.

683

684          109. Due to the fact that Baylor's response brief completely quashed Kuenzel's

685    threat of dismissal by misleading and misusage of an appellate Rule under color-of-law,

686    on February 7, 2023, Kuenzel simply signed, issued and enforced a mere "Notice"

687    dismissing Baylor case without **ANY** reason what so-ever, as shown below:

> **BY ORDER OF THE COURT:**
>
>     Petitioner's petition for writ of mandamus and his request to certify a question of great importance, as presented in his filing docketed in this court on January 25, 2023, are denied.
>     All filings in this Fifth District Court of Appeal case shall be submitted electronically to the Second District Court of Appeal through the Florida Courts E-filing Portal. Pro se submissions may be filed through the portal or by hard copy mailed to 1700 N. Tampa Street, Tampa, Florida 33602.
>     All filings shall be submitted electronically using case number 2D22-3565. All

688

689    110. In response to Kuenzel's vague and barebones Notice of dismissal without

690    any explanation as to the reason for denial, on February 23, 2023, Baylor filed a Notice

691    of Constitutional Challenge and Motion for Clarification, Certification, Rehearing,

692    Rehearing en banc, and issuance of a Written Opinion in the 2nd DCA.

693    111. As expected, Kuenzel, a mere clerk for the 2nd DCA, signed, issued and

694    enforced a baseless "Notice" guised as an Order, once more denying Baylor of any relief

695    absent reason for decision, as shown below:

>     Petitioner's motion for issuance of written opinion, clarification, certification, rehearing, and rehearing en banc is denied.
>
>     I HEREBY CERTIFY that the foregoing is a true copy of the original court order.
>
> lb
>
> *Mary Elizabeth Kuenzel*
> Mary Elizabeth Kuenzel
> Clerk



696

697    112. The unlawful Notices denying Baylor of any relief based on the fact that he

698    is Black and is presumed to has no knowledge of the law or understanding that the

699    Notices issued are unlawful, are solely made by a clerk of a court, and merely include

700    the typeset and last names of Patricia J. Kelly, Daniel H. Sleet, and Anthony K. Black, as

701    shown below:



> needed at www.2dca.org.
>
> KELLY, BLACK, and SLEET, JJ., Concur.
>
>        I HEREBY CERTIFY that the foregoing is a true copy of the original court order.
>
> jar
>
> *Mary Elizabeth Kuenzel*
> Mary Elizabeth Kuenzel
> Clerk

702

703        113.  And last names of Craig C. Villanti and Suzanne Labrit in another Order, as

704    shown below, contentions for the following section of this complaint:



> page of this court's website for further direction as needed at www.2dca.org.
>
> KELLY, VILLANTI, and LABRIT, JJ., Concur.
>
>        I HEREBY CERTIFY that the foregoing is a true copy of the original court order.
>
> dc
>
> *Mary Elizabeth Kuenzel*
> Mary Elizabeth Kuenzel
> Clerk

705

706        114.  Apparently, under White authority, Baylor is unable to obtain any relief in

707    any Florida State court even upon the issuance of a judicial Order by the State's highest

708    court. Plainly, because Baylor is Black and seeking relief against Whites, is effectively

709    barred from obtaining any adequate, effective or meaningful equitable or lawful relief,

710    remedy or redress in all of his cases or proceedings, even under extraordinary, special,

711    unique and unusual circumstances.

712    C.    Self Authenticated Documents Disguised As Orders Signed By Mere Clerks
713          Are Unlawful and Invalid

714          a)    Practice and Procedure Relating to Proof of Orders

715          115.  In another independent State court suit, Baylor first filed a legally sufficient

716    Verified Motion and Memorandum of Law on December 6, 2020 at 6:23PM, supported

717    by personal affidavit and three witness affidavits asserting a well-founded objective fear

718    of bias and prejudice, which was naturally denied December 9, 2020 at 10:20AM.

719          116.  Following denial, Baylor filed a Writ of Prohibition on December 11, 2020

720    at 4:43PM in the Florida 5th DCA, pursuant to Article V, Section 4(b)(3) of the Florida

721    constitution, and pursuant to Time Warner Entm't Co. v. Baker, 647 So. 2d 1070, 1071

722    (Fla. 5th DCA 1994)("Prohibition is proper upon denial of a motion to disqualify.")

723          117.  However, on January 12, 2021, Baylor's petition for Writ of Prohibition

724    was allegedly denied on the merits by Sandra B. Williams, as shown below.



725

118. The mere "Notice," disguised as an Order, is solely signed by Williams, and only includes the typeset last names of, F. Rand Wallis, Brian D. Lambert, and Eric J. Eisnaugle, which again, simply alleges that Baylor's petition for Writ of Prohibition is denied based on the merits.

119. However, the boiler plate statement on the face of the Notice plainly fails to address the merits of Baylor's petition, which should form the basis of a decision for "legal sufficiency." Instead, Williams' Notice purports that the doctrine of *res judicata* applies to Baylor's Writ of Prohibition filed in the 5th DCA for the very first time. But the case cited in the Notice only restricts the filing of "unelaborated denials entered in connection with all extraordinary writ petitions filed in any Florida court. . .[that] **shall not be considered decisions on the merits** which would bar the litigant from presenting the same or a substantially similar issue on appeal or by a subsequent writ petition, or by other means, in the same or a different Florida court." <u>Topps</u> So. 2d at 1254.

120. Based on law upheld by the State of Florida and general principle of *res judicata*, Baylor's petition should not, and could not have be denied on the merits or in the first instance of filing. Williams' Notice is unlawful and biased since it alleges that Baylor's petition is barred by issue or claim preclusion after being presented to the 5th DCA for the very first time.

121. As a result of the denial unsupported by the law cited, or any other palpable reason, on January 29, 2021 at 2:28PM, Baylor petitioned the Florida supreme court to review the denial of his petition for Writ of Prohibition, which could not possibly be barred by *res judicata* nor denied on the merits according to law still upheld by the State

748    of Florida's supreme court.

749        122. Nevertheless, approximately three (3) days following Baylor's submission

750    of his petition for review in the Florida supreme court, on February 1, 2022 at 5:02PM,

751    once again, Tomasino solely signed, issued and enforced a mere "Notice" disguised as

752    an Order dismissing Baylor's petition for review, as shown below:

> This case is hereby dismissed. This Court lacks jurisdiction to review an unelaborated decision from a district court of appeal that is issued without opinion or explanation or that merely cites to an authority that is not a case pending review in, or reversed or quashed by, this Court. *See Wheeler v. State*, 296 So. 3d 895 (Fla. 2020); *Wells v. State*, 132 So. 3d 1110 (Fla. 2014); *Jackson v. State*, 926 So. 2d 1262 (Fla. 2006); *Gandy v. State*, 846 So. 2d 1141 (Fla. 2003); *Stallworth v. Moore*, 827 So. 2d 974 (Fla. 2002); *Harrison v. Hyster Co.*, 515 So. 2d 1279 (Fla. 1987); *Dodi Publ'g Co. v. Editorial Am. S.A.*, 385 So. 2d 1369 (Fla. 1980); *Jenkins v. State*, 385 So. 2d 1356 (Fla. 1980).
>     No motion for rehearing or reinstatement will be entertained by the Court.
>
> A True Copy
> Test:
>
> _____
> John A. Tomasino
> Clerk, Supreme Court
> td
> Served:



753

754        123. Tomasino's Notice, the same as Williams', is signed, issued and enforced

755    by mere clerks citing to cases that have no bearing on the relief requested, issues at hand

756    and are unsupported dismissals.

757        124. The looming problem here, other than the Notices are not signed by any

758    judge/judges or justice/justices, is that the cases cited in Tomasino's Notice have long

759    been misconstrued to apply to unelaborated Orders that are not "*per curiam affirmed*"

760    decisions, rulings or opinions by or, of any court. Its usage has been conflated across

time, for decades, whereby no other law has been found to support its application except the gross misusage by clerks. Of course, when challenged, clerks are permitted to simply dismiss any and all claims without reason or written opinion, and because Florida courts have been shown to be implicitly biased, the matter is now ripe for review.

125.  Here lies a problematic issue were mere clerks are allowed to practice law in cases brought by Black *pro se* litigants, which may easily be dismissed by clerks who act as arbiters and depositors of fundamental rights under misconstrued and misapplied cases-doctrine when faced with actual questions or matters of law, which supports biased and shadowed discriminatory conduct.

126.  Again, the cases cited by Tomasino in its Notice, primarily and specifically apply to "*per curiam affirmed*" ("PCA") decisions only. But clerks continue to apply the law to unelaborated Orders that are not PCA. A *per curiam* decision is a court opinion issued in the name of the Court rather than specific judges. While Williams' alleges in that its Notice is an "Order by the Court," nonetheless, PCA merit decisions commonly take the form of one or more opinions written and signed by individual judges, not clerks, and are surely not issued in the form of Notice made in the appearance of a valid court Order, which will continue to be referred to as "Notices," since clerks are without any authority to issue actual Orders under the circumstances. For example:

> "An `order of court' has been defined as one made in open court by a judge of the court who is present at the place designated for the transaction of judicial business and there assumes to transact such business. 60 C.J.S. Motions and Orders, § 2(b)"

785    127. Tomasino's Notice is individually signed and issued on its own authority.

786    While Williams' Notice does include the typeset, but last names of Wallis, Lambert and

787    Eisnaugle, the mere inclusion of last names does not make the Notice any more valid,

788    nor makes it a unanimous nor decision issued by a single judge, or in fact, by any judge.

789    Thus Williams' Notice denying Baylor's Writ of Prohibition is not a PCA decision from

790    which Tomasino could issue any denial, especially since judges'/justices' names still

791    appear. The decision, or rather "Notice," must be unsigned for it to count as one of the

792    relevant *per curiam* examples. Even though Tomasino's Notice is absent any

793    judges'/justice's signature, the most important factor here is that Williams' Notice is not

794    said to be "*per curiam affirmed,*" thus cannot be denied.

795    128. Restated, Tomasino's Notice of dismissal is woefully unlawful and reflects

796    a practice of law under color-of-law to support a biased attitude towards Baylor. Nothing

797    appears accept its own hand-written signature upon its own authority to do whatever it

798    damn well pleases, which includes the erroneous citation to laws that does not apply.

799    Furthermore, even in the complete absence that Williams' Notice is **not** said to be a PCA

800    decision, opinion or ruling, issuance is way beyond the explicit statutory, constitutional

801    and administrative or ministerial powers of a mere clerk. According to Florida, the:

802            "supreme court shall appoint a clerk who shall .
803            . . perform such duties as the court directs.
804            [but]. . . shall not engage in the practice of law
805            while in office." Fla. R. Jud. Admin. 2.205(b)
806            (1).

807    129. Irrespective of the clerks' misapplication of law, in both the 5th DCA and

808    Florida supreme court, Baylor was denied, and continues to be denied relief based on

809    retaliation, and biased decisions which deprive and continue to deprive him of the access

810    to the same court procedures and State laws providing protection against biased, partial

811    decision-makers, liberally given to Whites.

812         130. Clerks in and for the Florida Fifth and Second District Court of Appeal,

813    and Florida Supreme Court, institute, operate and enforce an unofficial policy, custom,

814    and practice of assisting judges and justices with disposing of fundamentally important

815    issues in cases filed by Black *pro se* litigants, to control its docket under an unauthorized

816    practice, procedure, custom or policy of issuing Notices with the typeset names of judges

817    or justices to give the Notices an authoritative appearance.

818         131. However, this unspoken, undocumented, unwritten, unofficial, and implicit

819    practice, procedure, custom or policy has continued over the course of at least until such

820    time of Baylor's first commencement of his cases in 2018', which is unlawful.

821         132. The clerks' certified copy of its own copy does not certify or confirm that it

822    is in fact a copy of, or that there was ever a primary or original document that contains a

823    genuine or valid signature of any judge or justice, only that the clerks' copy is a copy of

824    itself. This means that if the primary document is not legitimate, it cannot be used to

825    guarantee review in any other court, thus violates the right of access.

826        b)  <u>Electronic Signatures Are Only Valid in Business Contracts</u>

827         133. The Electronic Signatures in Global and National Commerce ("the E-Sign

828    Act"), was signed June 30, 2000. It declared the legitimacy of electronic signatures for

829    transactions affecting interstate and foreign commerce. However, courts have misused

830    and misconstrued language in the Act to suggest that it pertains to court documents and

831   legal procedures.

832        134.  While the E-Sign Act validates the use of electronic records for consensual

833   written agreements and contracts, the fact that the Act states that "an electronic record,

834   contract, or e-signature cannot be denied on the basis of its electronic format," does not

835   pertain to court procedures, neither grants court clerks permission to sign, enforce and

836   dispose of questions of law, or matters that raise constitutional violations. The Act does

837   not authorize management or control of court dockets, no matter how full.

838        135. According to the E-Sign Act, only specific business documents may be

839   signed electronically. Some examples include:

840        •   Non-disclosure confidentiality/confidential disclosure agreements.

841        •   Forms for student absence, notifications, accessibility and grade disputes.

842        •   Sales contracts or agreements between seller and buyer regarding sale of goods
843            or services.

844        •   Statements of work or agreements outlining terms between vendor and client.

845        •   Purchase orders issued between buyer and seller indicating type, quantity, and
846            price agreed upon for products or services.

847        •   Patient intake forms designed to collect important information regarding patients
848            at medical practices.

849        136.  The E-Sign Act, however, was never intended to include:

850        •   Testamentary trusts, codicils and wills,

851        •   Documents regarding adoptions, divorce, family law, or official court documents,

852        •   Utility service cancellation notifications (including water, heat, and power),

853        •   Health or life insurance policy termination notices (excluding annuities),

854        •   Recall notices for products that pose a health risk,

855        •   Documents regarding the transport of hazardous materials, pesticides, or other
856            toxic substances.

Page **57** of **105**

137.  Apart from the Uniform Electronic Transactions Act of 1999, and the 21st Century Integrated Digital Experience Act, the E-Sign Act validates the use of electronic signatures for legally binding documents, but in a way to regulate and ensure consistent use of e-signatures in interstate and foreign commerce only.

138.  The ESIGN exception for court documents removes pleadings, briefs, court Orders, and other documents including Notices, pertaining to processing of cases before courts, from such operation. Bottom line, only businesses are free to operate efficiently and utilize electronic signature technology at their disposal.

139.  Since the passage of the E-Sign Act, federal and State courts have indeed established electronic filing and access systems for court records and documents. But these systems have only allowed the use of electronic signatures by attorneys or litigants, and access to electronic documents to provide access to documents over the Internet, and provide an option for litigants and attorneys to file briefs, pleadings, and other papers in court cases using electronic methods.

140.  The Case Management/Electronic Case Filing systems (CM/ECF), a prime example, simply allows attorneys to file court documents from their offices and gives judges, court staff, attorneys, and the public immediate access to such documents.

141.  However, nothing gives clerks power or authority to sign and enforce legal documents pertaining to dispositive issues involving constitutional violations in cases filed by unrepresented Black litigants. No law supports such conduct other than the rule of White supremacy, to do and act that Whites normally do without oversight.

142.  The commonly abused and catchall phrase, "electronic signatures have the

879  same legal effect as written signatures," while included in the provisions, can neither be

880  used nor is supported by the Florida Legislature enactment of the State Statute long ago,

881  which allows **businesses** to operate in an efficient, electronic manner.

882     143.  The Electronic Signature Act of 1996 (ESA), Florida Statutes §§ 668.001–

883  006, unless "otherwise provided by law," does not authorize any clerks to sign or enforce

884  court documents masked as Orders disposing of constitutional or Civil Rights claims.

885     144.  While Florida's Uniform Electronic Transaction Act (UETA), F.S.§668.50,

886  addresses broader aspects of electronic documents, such as legal effect, replacement of

887  original documents, and transferability, the Statute does not authorize clerks to sign and

888  enforce legal documents such Notices disguised as Orders, even upon the inclusion of

889  judges or justices typewritten, last names.

890     145.  In other words, pursuant to Fla. Stat. Section 668.50 (7)(b)("**contracts** may

891  not be denied legal effect or enforceability solely because an electronic record was used

892  in the formation of the **contract**"). However, pleadings, briefs, court Orders, and other

893  legal documents pertaining to the processing of a case are not a contract, nor do they fall

894  within matters relating to interstate commerce.

895     146. Even in the event it could be argued that the clerks' Notices masked as

896  Orders were somehow valid, none of the signatures comply with requirements set-forth

897  by the Acts or provisions of the Statutes, for the signing of documents electronically.

898     147. In the case of <u>Derrick Fenley v. Rite Aid Corp</u>. 2014 Cal. Super. LEXIS

899  156 (Cal. Super. Ct. July 2014), the court said that the law requires legal documents be

900  "subscribed" (signed with one's own hand), and requires declarants to sign a printed

document first; *See also* <u>In re Mayfield Nos</u>., 16-22134-D-7, UST-1, 2016 Bankr. LEXIS 2613 (Bankr. E.D. Cal. July 15, 2016)("DocuSign could not be used to satisfy local court rules, which require counsel to maintain and provide original signed documents, excluding "software-generated" electronic signatures")(Note: Judge Bardwil goes on to suggest that an electronic signature may be more easily forged than a paper-based signature.)

148. Judge Bardwil's opinion follows the established notion that unrepresented Black litigants are forced to "assume that the certified [Notice] is a true copy of the proceedings in the cause." <u>Shannon v. State</u>, 89 Fla. 226 64, 102 So. 829 (Fla. 1925). But court also said, "If there is any doubt as to the existence of authority to do a particular thing, it should not be assumed." <u>Gessner v. Del-Air Corporation</u>, 17 So.2d 522 (Fla. 1944). It is said elsewhere, that "the burden of rebutting that assumption is upon the [Plaintiff]." *see* generally, 31A C.J.S. Evidence § 111, pp. 188, 189.

149. Given this context, clerks cannot without express constitutional or statutory authority exercise any judicial functions, and the court has no power, in the absence of statutory authority, to delegate such matters to the clerk, although the clerk may properly perform acts which are classified as ministerial. *see* 14 C.J.S. Clerks of Court, § 35.

150. The assumption that the clerks' Notices are valid, may be rebutted with evidence to the contrary, as shown below, which are the kinds of Orders "that may be judicially noticed and can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." The Orders below contain validly signed signatures that are in accordance with the E-Sign Act, that may not be easily disputed.

923    For example: Questionable Order signed by a Judge, without court "seal":



924

925          151.  Partially valid Order signed by a Judge, with court seal:



926

927          152.  Wholly valid Order signed by a Justice, Deputy Clerk, with court seal:



928

929          153.  Questionable Orders signed by Judges without seal:



930

931

932

933

934          154.  Compared to Notices masked as Orders disposing of Baylor's claims and

935  cases, the clerks' documents are solely signed by a clerk, and merely include typewritten

936  last names of individuals that are not in accordance with any standard approved by law,

937  thus may be denied legal effect or enforceability all together.

938          155.  Below, nothing indicates that the clerks' mere Notice is certified to be a

939    true copy of any original Order that is signed by any judge as shown below:

> ORDERED that the Petition for Writ of Prohibition, filed December 11, 2020,
> and the Amended Petition, filed January 6, 2021, are denied on the merits. See Topps
> v. State, 865 So. 2d 1253 (Fla. 2004).
>
> I hereby certify that the foregoing is
> (a true copy of) the original Court order.
>
> *Sandra B. Williams*
> SANDRA B. WILLIAMS, CLERK

940    Panel: Judges Wallis, Lambert, and Eisnaugle

941        156.  The Notice, which merely includes the typeset names of individuals said to

942    be a "panel", is not conclusive of any fact other than the clerk is merely purporting to

943    state the Notice is actually an original copy of its own Notice, which does not constitute

944    nor give the Notice illustrated as an Order, any authoritative value, nor do the last names

945    produced show that an actual Order was signed by any judge/judges or justice/justices.

946        157.  The same could be said for the following Notice:

> needed at www.2dca.org.
>
> KELLY, BLACK, and SLEET, JJ., Concur.
>
>     I HEREBY CERTIFY that the foregoing is a true copy of the original court order.
>
> jar
>
> *Mary Elizabeth Kuenzel*
> Mary Elizabeth Kuenzel
> Clerk



947

948        158.  Only last names of individuals appear, but without more, is solely signed,

issued and enforced by a mere clerk who has no constitutional or statutory authority to do so. Under the circumstances, the clerks are obligated, by law, to provide Baylor with an original copy an Order signed by a judge/judges or justice/justices. The law provides that "clerks" are required to "maintain and provide original signed documents, excluding "software-generated" electronic signatures."

159.  Therefore, jurisdiction is proper in this Court for the issuance of injunctive and declaratory relief against the overreaching and abusive authority of mere clerks.

160.  Baylor is substantially prejudiced, and whatever rights that he may have are permanently impaired and irreparably harmed if Defendants are allowed to continue to implement and enforce such unconstitutionally unlawful Notices masked as a valid court Orders.

D. "If the State Chooses to Afford Appellate Review, it Can No More Discriminate on Account of Poverty Than on Account of. . Race, or Color"

161.  Baylor's lack of any right to relief, remedy or redress, has also become apparent in other instances where he seeks to have issues reviewed or answered under a constitutional basis that not only has adverse impact on individuals, but groups, and may have State or even Nationwide implications if the issues in question would negatively affect non-residents from another State. However, despite raising matters of significant importance for consideration, even beyond the jurisdiction of the courts, Baylor has not had any issues heard because he is Black and the State's forum is implicitly biased against him.

162.  Otherwise, there is no legally valid reason or palpable excuse for declining

971 to answer matters that have such constitutional significance.

972     a) <u>Florida Statute, Title VI, Chapter 83, Section 83.60 is Unconstitutional On Its</u>
973     <u>Face</u>

974     163. More than half a million people experienced homelessness in the U.S. in
975 2022, a number that has increased each the year since 2016.



976

977     164. Florida, California, New York, and Washington had the most homeless in
978 2022 according to the Annual Homeless Assessment Report. The four states accounted
979 for more than half of the nation's homeless population.

980     165. Homelessness data from 2019 and earlier years reflect existing disparities
981 in Black communities. The numbers are larger for groups like Black Americans (55 out
982 of every 10,000), compared to (17 out of every 10,000) Whites Americans.

983     166. Although the relationship between vulnerability and eventual homelessness

984 related to Fla. Statute §83.60 is not fully clear, its enactment contributes to homelessness

985 and raises concerns that exacerbate racial and ethnic disparities among Black people in

986 Florida facing financial hardship and homelessness.

987  167. Historically, Blacks in Florida, and America, are economically vulnerable.

988 Not only are Black people more likely to be among the working poor and near poor and

989 underemployed and the unemployed, are also less equipped to weather looming storms

990 or actual recessions, or national crisis such as COVID-19. Fifty-eight percent of Black

991 people are liquid asset poor (lacking cash and savings to survive at the poverty level for

992 three months), compared to Whites at thirty-seven percent.

993  168. When enforced against indigents, compared to the rich or financially stable,

994 on all accounts, Florida Statute 83.60 is unconstitutional on its face since it includes a

995 "pay-to-defend" requirement that creates an unfair and unnecessary financial barrier

996 between groups and individuals, which is a fundamental violation of the procedural Due

997 Process and Equal Protection Clause to the United States Constitution, and Fair Housing

998 Clause to the Civil Rights Act. That is of course, if Baylor has any Civil or constitutional

999 rights to begin with. Regardless of this fact, the State of Florida has created a draconian

1000 procedural and substantive barrier that makes it impossible for all tenants, Black, White,

1001 Hispanic, Native American or other, to have their fair day in court.

1002  169. The "pay-to-defend" requirement forces eviction defendants to deposit rent

1003 as a precondition for defense, which raises another vital concern if landlords could use

1004 subterfuge to terminate a lease or rental agreement on the basis of race, which falls under

1005 the same defense for non-payment when the underlying basis for terminating a lease or

1006    rental agreement if Blacks are repeatedly late on payment of rent, which would be cause

1007    for a lease or rental agreement to expire for that reason, hidden by discriminatory intent.

1008       170. Data shows that landlords filed

1009    more cases evicting tenants during pandemic

1010    and post-pandemic times, not for failing to

1011    pay rent, but for overstaying after expiration

1012    of a lease. That represents a 117% increase

1013    in filings compared to previous years. But

1014    during pre-pandemic times, evictions related

1015    to expired leases made-up only 1 to 2% of

1016    evictions cases filed, according to the Public

1017    Justice Center.





1018       171. Now, landlords realize that they

1019    can evict tenants holding-over because the

1020    Statute does not protect against expiration or

1021    non-renewal of a lease, even when landlords

1022    may discriminate in retaliation for late rental

1023    payments — the actual underlying reason —

1024    Fla. Statute §83.60 ousts tenants irrespective

1025    of such intent, which is antithetical to the

1026    Due Process and Civil rights of low-income

1027    litigants, such as Blacks.

1028     172. If a landlord wants a tenant out, the landlord can simply opt to not renew the

1029     tenant's lease. If the tenant fails to move out before expiration of a lease, the landlord can

1030     evict for non-payment by laying the groundwork for eviction for other than payment.

1031     173. §83.60, F.S. not only protects

1032     wealthy landlords but also wealthy tenants

1033     who may simply refuse or chose not to pay

1034     rent, but can afford to pay to defend. Under

1035     the current revision of the Statute, a wealthy

1036     tenant, after non-payment, may categorically

1037     raise defenses that would effectively allow it

1038     to be heard before the deprivation of a real

1039     property interest. As it currently stands, the

1040     Statute is a one-way street against indigent

1041     litigants, flowing straight toward eviction.





1042     174. In favor of a wealthy landlord or

1043     tenant, the Statute alienates Due Process and

1044     Civil right defenses that cannot be raised,

1045     since indigents are without the ability to pay.

1046     Indigent defendants may be evicted based on

1047     "nonpayment", subsumed under other causes,

1048     but they have no money to prepay-to-defend,

1049     and their defenses are never heard.

1050        175. The United States Supreme Court has made it clear that such procedures are

1051    violative of the Due Process rights of low-income litigants. For more than a decade, a

1052    continuing line of cases has reached the U.S. Supreme Court concerning discrimination

1053    against indigent defendants, beginning with <u>Griffin v. Illinois</u>, 351 U.S. 12 (1956), where it

1054    was held that equal justice was not afforded an indigent where the nature of the review

1055    "depends on the amount of money he has," at 19,

1056    and continuing through <u>Douglas v. California</u>,

1057    372 U.S. 353 (1963), where the Supreme Court

1058    has consistently held invalid procedures "where

1059    the rich man. . . . enjoys the benefit of counsel's . . .

1060    while the indigent . . . is forced to shift for

1061    himself." *Id*. at 358.



1062        176. Again, the pay-to-defend requirement has turned Florida eviction actions

1063    into a one-way street flowing straight toward eviction, where Due Process has become a

1064    meaningless promise to the poor. Instead, regardless of the merits of their defenses, even

1065    in the instance where Notice is improper, faulty or fraudulent, indigent tenants are either

1066    promptly evicted under a court-ordered writ of possession or forced to settle their cases

1067    unfavorably. This Due Process crisis was expanded in the advent of the vast economic

1068    disruptions of the pandemic, and are ongoing.

1069        177. Florida courts are knowingly putting expediency ahead of Due Process by

1070    conditioning prepayment of rent in order to raise defenses, which constitutes unlawful

seizure by State government. The right of the people to be secure in their houses, and or things to be seized may even be protected by the Fourth Amendment to the United States Constitution, since the Order made violates Due Process, and may therefore be void.

178. Obviously, Due Process requires that there be a adequate, reasonable and meaningful opportunity to present every available defense. The legal test for analyzing procedural Due Process under both the United States and Florida constitution, relying on the three-factor analysis found in <u>Mathews v. Eldridge</u>, 424 U.S. 319 (1976), all fail:

- "first, the private interest that will be affected by the official action";

- "second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards"; and

- "finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail."

179. Here, application of the three Mathews factors leaves no question that the pay-to-defend provision violates procedural Due Process:

➢ **First**, posting rent has a more devastating and disparate impact on the private interests of Black tenants, because they are eviction defendants who first, cannot afford to pay to rent, thus deprived of their ability to invoke any Civil or constitutional Due Process rights as a defense at the exact moment needed, which is surely before the loss or deprivation of property.

1094          180.   The result of eviction circumvents

1095   civil right and Due Process protections which

1096   deprives all indigent defendants of a significant

1097   constitutionally based property interest such as

1098   the right to continued residence in their homes,

1099   that is further threatened when the limitation of

1100   a nonwaivable and court-like cost or fee forces

1101   indigent tenants to leave their home and renders

1102   them homeless. Likewise, court Order evictions



1103   greatly increases both short-term and long-term risks of homelessness, because it places a

1104   negative mark on the defendant's rental history, which often leads to a future of shelters

1105   for the defendant or defendant and family. Not only are property interests involved, but a

1106   person's reputation, good name, honor, or integrity is at stake because of governmental

1107   interference or action. Here, the tenant is entitled to procedural Due Process.

1108          181. As of January 2020, Florida had an estimated 27,487 homelessness on any

1109   given day, as reported by Continuums of Care to the U.S. Department of Housing and

1110   Urban Development (HUD). Of that total: 2,294 were family households; 2,436 were

1111   Veterans; 1,331 were unaccompanied young adults (aged 18-24), and; 5,182 were

1112   individuals experiencing chronic homelessness.  Public school data reported to the U.S.

1113   Department of Education during the 2018-2019 school year shows that an estimated

1114   91,068 public school students experienced homelessness over the course of the year. Of

1115   that total: 6,717 students were unsheltered; 7,606 were in shelters; 11,004 were in

1116 hotels/motels, and; 65,741 were doubled up. Florida style evictions vastly contributes to

1117 these statistics. Homelessness is inimical to public health, safety, and welfare.



1118 182. Further, even if indigent defendants are

1119 able to deposit rent versus rich, property deprivations

1120 are significant. Money is a core property interest, and

1121 the fact that indigents may lose their money, even only

1122 temporarily, does not put the seizure beyond scrutiny

1123 under the Due Process Clause. Any significant taking

1124 of property by the State is within the purview of the

1125 Fourth and Fourteenth Amendments, and as long as

1126 landlords are able to put forth an offense other than for

1127 payment, the action may be fast tracked as a summary

1128 case and the eviction defendants could lose money in

1129 the event Notice is not given, which constitutes "sewer

1130 service[3]" violating the Due Process Clause.

1131 183. Some eviction defendants may have turned to receiving housing assistance

1132 under Section 8 or another State funded housing program, but a landlord could decide to

1133 not renew leases or rental agreements for that reason. No wear in the provision does it

1134 protect people whose landlords wish to evict tenants and know of the glaring loophole in

1135 the Statute available to eliminate undesirables, who are in fact unable to pay.

---

[3] "Sewer service" is the term used when a process server "fail[s] to serve the summons and complaint but still submit[s] proof of service to the court." <u>Sykes v. Mel S. Harris and Assocs. LLC</u>, 780 F.3d 70, 76 (2d Cir. 2015).

➢ **Second**, erroneous deprivation of private interests is inevitable, because there can be more real or actual pre-deprivation hearing before rent, just like court costs and fees, must be paid into the court registry — much less the constitutionally mandated "opportunity to be heard at a meaningful time and in a meaningful way," especially defenses that may implicate fraud or improper service to obtain personal jurisdiction or judgment without hearing.



184.   *Mathews* itself made clear, the "right to be heard before being condemned to suffer grievous loss of any kind. . . . is a principle basic to our society." (Emphasis added.) At the heart of the Due Process clause is the "root requirement that an individual be given an opportunity for a hearing before he is deprived of any significant property interest, except for extraordinary situations where some valid governmental interest is at stake that justifies postponing the hearing until after the event." (Emphasis added.) Such a pre-deprivation hearing does not take place. Worse still, there is no post-deprivation appeal on any defense for those tenants who do not pay into the court's registry.

185.   In Lewis v. Casey, 518 U.S. 343, 116 S. Ct. 2174 (1996), the Court said, "*Douglas* turned not on a right of access *per se*, but rather on the right not to be denied, on the basis of poverty, access afforded to others. [A] State may not grant appellate review in such a way as to discriminate against some [] defendants on account of their

1158  poverty." This is precisely the case when Florida court's would not necessarily dismiss

1159  an indigent tenant's appeal, but in the same instance affirm the eviction court's decision

1160  without determining if the tenant's rights were violated. Such a review is meaningless

1161  and does not afford the litigant any real opportunity to post-deprivation relief.

1162  ➢  **Third**, any procedure that impedes

1163  tenants in asserting their Civil or Due Process

1164  rights, is contrary to the "policy of the United

1165  States to provide, within constitutional limitations,

1166  for fair housing throughout the United States, as

1167  the declaration explains in the Fair Housing Act,

1168  42 U.S.C. §3601. Legislative objective in enacting

1169  the Act was clearly to assure adequate and fair

1170  housing within the States. But if a landlord is



1171  entitled to regain possession of its premises in spite of his failure to renew covenants, the

1172  purpose of protecting tenants against bad faith acts has clearly been frustrated.

1173  186.  As it stands, Florida tenants may only defend in two types of actions:

1174
> (1)(a)  In an action by the landlord for possession of a dwelling unit based upon nonpayment of rent

1175
> (1)(a)
>   or in an action by the landlord under s. 83.55 seeking to recover unpaid rent,

1176  187.  In sum, the prepayment of rent or pay-to-defend requirement plainly fails

1177  all three of the *Mathews* factors, and therefore violates Civil Rights and procedural Due

1178  Process under both the U.S. and Florida constitutions.

1179    188.   Therefore, the court is asked to certify the question below as one of public

1180    importance:

1181             "DOES FLORIDA STATUTE SECTION 83.60
1182             DEPRIVE INDIGENT LITIGANTS OF SPEECH,
1183             ACCESS TO COURTS, OPPORTUNITY TO BE
1184             HEARD, EQUAL PROTECTION, MEANINGFUL
1185             RIGHT TO APPEAL, AND RIGHT TO DEFEND,
1186             IN TRIAL COURT AND POST RELATED CASES
1187             RELATED TO THE UNDERLYING EVICTION IF
1188             UNABLE TO PAY?"

1189             **V.    CLAIMS FOR RELIEF**

1190             **COUNT 1**

1191        **VIOLATION OF THE FIRST AMENDMENT**
1192            **(Against All Defendants)**

1193    189.   Baylor re-asserts and incorporates by reference as if fully set forth herein

1194    the assertions in all preceding paragraphs.

1195    190.   The First Amendment, in relevant part, provides that "Congress shall make

1196    no law ... abridging the freedom of speech." U.S. Const. amend. I. The Fourteenth

1197    Amendment makes this prohibition applicable to the States.

1198    191.   Baylor's procedural contentions are that Defendants failed to: (1) provide

1199    Notice for each court recorded action; and (2) failed to provide or consider relief under

1200    law, which stymied the right to petition and access the court for review pursuant to 28

1201    U.S.C. § 1257.

1202    192.   Baylor first engaged in protected First Amendment speech and activity on

1203    or about August 2018, personally and by his own hand, by petitioning Florida courts for

1204    equitable and legal remedies, relief or redress for grievances. Not once has Baylor been

1205     granted a single iota of meaningful relief, remedy or redress for more than four (4) years,

1206     because Defendants are acting outside of the law, so as to now expose their prejudice,

1207     bias and discriminatory acts and omissions to the public at large, as well as show the fact

1208     that Blacks, such as Baylor, have no Constitutional rights Whites would respect.

1209         193.   By seeking disqualification of White State officials in Florida's circuit and

1210     district court, in consort with one another, Defendants now deny Baylor of the requisite

1211     Notice of final opinions and record activities in his appellate cases required to be given

1212     pursuant to State Statute, local Rules and administrative Orders, but Defendants' refusals

1213     are acts or omissions that further chill Baylor's personal right to engage in free speech

1214     thereon, especially in the context where such refusal would no longer afford him any

1215     right or opportunity to seek relief pursuant to 28 U.S.C. § 1257(a). It is well settled that

1216     "[t]he First Amendment right to free speech includes not only the affirmative right to

1217     speak, but also the right to be free from retaliation by a public official for the exercise of

1218     that right." Suarez Corp. Indus, v. McGraw, 202 F.3d 676, 685 (4th Cir. 2000).

1219         194.   The First Amendment protects the public's right of access to information

1220     about their officials' public activities. It "goes beyond protection of the press and the

1221     self-expression of individuals to prohibit government from limiting the stock of

1222     information from which members of the public may draw." First Nat'l. Bank of Bos. v.

1223     Bellotti, 435 U.S. 765, 783, 98 S. Ct. 1407, 55 L.Ed.2d 707 (1978). Docket sheets exist

1224     to "provide a map of proceedings in the underlying case," ensuring "meaningful access"

1225     to proceedings. Hartford Courant Co. v. Pellegrino, 380 F.3d 83, 95 (2d Cir.2004);

1226     United States v. Valenti, 987 F.2d 708, 715 (11th Cir.1993). Hence, Baylor essentially

1227   seeks Notice and opportunity to participate, or be heard, in proceedings following the

1228   retaliation by Defendants for seeking disqualification of certain White State officials.

1229       195.   Whether any Defendant acting in retaliation is a bystander acting pursuant

1230   to direction, privately or individually at the time Baylor's protected First Amendment

1231   actions were and still taking place, are at all times subject to every manner of restriction

1232   limiting Baylor's ability to record or receive any Notice of appellate court actions, and

1233   causes Baylor to remain unlawfully restricted from petitioning, responding, replying,

1234   receiving or seeking review based on evidence for use in subsequent civil proceedings

1235   necessary as a consequence of Defendants' biased and retaliatory conduct.

1236       196.   Surely Congress did not intend that courts wrestle in every instance in the

1237   course of litigation against a private party, and surely Whites can have no greater right of

1238   access than Blacks, in matters involving a party's own fundamental rights. Not only does

1239   the presumption of common law right to petition government for grievances strike at the

1240   State law essential purpose, it entangles itself with the Constitution in incongruous ways.

1241   Florida State provides for example, "Rule[s] must yield to the provision. . . that the

1242   Supremacy Clause invalidates State laws that 'interfere with, or are contrary to,' federal

1243   law." AmMed Surgical Equipment, LLC v. Professional Medical Billing Specialists,

1244   LLC, 162 So. 3d 209 (Fla. 2nd DCA 2015).

1245       197.   When Notice will not be given pursuant to 9.420(c) or opportunity to be

1246   heard pursuant 9.330, and are thus made discretionary, or substantially delayed or denied

1247   based on racism, the abuse of conduct implicates Baylor's right of access and chills his

1248   speech, therefore Defendants should not allowed to continue to clandestinely prescribe a

1249    very particular procedure that the District Courts must follow.

1250       198.   Defendants made a measured and specific determination as to its refusal

1251    based on racial discrimination and retaliation, and Ordered that no documents or actions

1252    specified in Baylor's cases should be accompanied by Notice, and made it so that he will

1253    never be issued a written opinion in any case so as to cause his cases to end just below

1254    the State's highest court. Defendants have clearly outlined its rationale through acts and

1255    omissions by hiding actions and documents in cases; by refusing to provide Notice, and;

1256    approved certain acts and omissions permitting the non-disclosure of court actions and

1257    documents to Baylor.

1258       199.   To determine whether the First Amendment provides a right to access court

1259    Orders and proceedings, the "experience and logic" test asks "(1) 'whether the place and

1260    process have historically been open to the general public,' and (2) 'whether public

1261    access plays a significant positive role in the functioning of the particular process in

1262    question.' " Press–Enterprise Co. v. Superior Court, 478 U.S. 1, 8–10, 106 S. Ct. 2735,

1263    92 L.Ed.2d 1 (1988)). Here, both prongs are satisfied. Secret docketing of proceedings

1264    violates First Amendment right of access. In re State–Record Co., 917 F.2d 124, 128–29

1265    (4th Cir.1990).

1266       200.   Defendants engage in non-judicial, private actions which were not taken in

1267    any judicial capacity, which is neither an adjudication of rights between any parties, or

1268    final judgment, or could affect any final judgment. Defendants engage in functions and

1269    behaviors and conduct that is not normally performed by a judge and which are wholly

1270    outside the expectations of litigants in the Florida courts. Defendants' personal direction

of, and personal participation in the chilling and violating of Baylor's First Amendment rights by stopping him from receiving any equitable or lawful relief, remedy or redress of personal injuries, damages, grievances in proceedings where he has been humiliated, harassed, abused and victimized by other parties, including Defendants, for more than four (4) years, is based on Defendants' use of racial and ethnic bias consisting of an individual or administrative or ministerial act.

201.   Baylor remains engaged and deprived of First Amendment activity.

202.   As a direct and proximate result of Defendants' violation of Baylor's First Amendment rights, Baylor is injured, for which he is entitled to injunctive relief. No punitive or monetary damages are sought against Defendants.

## COUNT 2

**VIOLATION OF THE FOURTEENTH AMENDMENT DUE PROCESS**
**(Against All Defendants)**

203. Baylor re-asserts and incorporates by reference as if fully set forth herein the assertions in all preceding paragraphs.

204. By the acts and omissions described above, Defendants, acting under color of state law in their official and individual capacities as integral members of the Ku Klux Klan, violate Baylor's rights under the Fourteenth Amendment to the U.S. Constitution, which include but are not limited to:

a.   An unbiased forum, fair and impartial judges/justices/decision-makers,

b.   Timely and adequate Notice of a proposed action,

c.   Inspection and receipt or copy of judicial records and documents,

1293        d.   Opportunity to be heard why a proposed action should or not be taken,

1294        e.   A decision solely on the legal rules and evidence adduced at a hearing,

1295        f.   A decision based exclusively on evidence and facts presented by both parties,

1296        g.   Stated reasons for determination and indication of relevant law relied on,

1297        h.   An evidentiary hearing before permanent termination of rights,

1298        i.   Opportunity to be heard at a meaningful time and in a meaningful manner.

1299        205.   The U.S. Constitution, the Supreme Law of the Land, prohibits government 1300 from depriving citizens of life, liberty and property interests, without due process of law. 1301 The Supreme Court has emphasized time and again that the touchstone of Due Process is 1302 protection of an individual against arbitrary action of government. County of Sacramento 1303 v. Lewis, 523 U.S. 833, 845 (1988).

1304        206. Defendants have not provided Baylor with the basic Due Process right to 1305 receive a copy of court documents entered in his cases or Notice of actions taken against 1306 him, which he is entitled to under Florida's Statutes, Rules and administrative Orders in 1307 all proceedings, even upon following denial of all applications for Motions to Disqualify 1308 and against retaliation from exercising his rights, beginning December, 2021.

1309        207. Defendants' custom, policy or practice of regularly restraining Baylor from 1310 receiving any Notice in his appellate cases, enforced by administrative decisions against 1311 State's laws, Statutes, Rules and administrative Orders, establishes that Blacks, such as 1312 Baylor, have no constitutional right to Due Process. This purported right requires that 1313 Defendants provide process to Baylor without unilaterally instituting an implicit custom, 1314 policy or practice of barring him to Notice and access in all proceedings. Defendants'

1315  custom, policy or practice deprived and deprives Baylor of his right to be free from

1316  unlawful deprivations without Due Process of law.

1317  208.  Defendant, as to, CURTIS JACOBUS, did not first provide Baylor with the

1318  basic Due Process right to an impartial judge in all proceedings where it presides and,

1319  where it clearly appears to the court that a fair hearing or decision could not be had in the

1320  county or court where the proceedings were and remain pending, or where the ends of

1321  justice would best be promoted by the change.

1322  209.  Defendants all together act outside the purpose of law and Baylor's petition

1323  for disqualification, in a manner wholly absent of Due Process rights which purports that

1324  citizens, including Blacks such as Baylor, are entitled to fair and impartial proceedings,

1325  forums and judges, but the Defendants have declined to enforce any law in a manner that

1326  is wholly inconsistent with the nature of fair judicial proceedings generally seen ruled in

1327  favor of, or protected in cases brought by Whites only.

1328  210.  "[T]here can be no doubt that minimum [procedural due process] require[s]

1329  that deprivation of life, liberty or property by adjudication be preceded by notice and

1330  opportunity for hearing appropriate to the nature of the case." Mullane v. Cent. Hanover

1331  Bank & Trust Co., 339 U.S. 306, 313 (1950). "A fair trial in a fair tribunal is a basic

1332  requirement of due process." In re Murchison, 349 U.S. 133, 136 (1955). Due process

1333  guarantees the right to a neutral, detached judiciary in order "to convey to the individual

1334  a feeling that the government has dealt with him fairly, as well as to minimize the risk of

1335  mistaken deprivations of protected interests." Carey v. Piphus, 435 U.S. 247, 262 (1978).

1336  Principles of Due Process demand that Baylor's cases be heard in another county or by

1337   another judge, in Florida.

1338       211. The actions by Defendants, as described herein, intentionally deprived and

1339   continues to deprive Baylor of the securities, rights, privileges, liberties, benefits and

1340   immunities secured by Whites only, under the White Constitution of the United States of

1341   White America, and thus caused and continues to cause Baylor injury and substantial

1342   prejudice in all suits, actions and proceedings.

1343       212. The acts and/or omissions of Defendants were and are conducted outside

1344   the scope of their official duties under color of law.

1345       213. Defendants subjected and continues to subject Baylor to unspoken customs,

1346   policies and procedures by depriving him of the most basic rights described herein, with

1347   conscious and reckless disregard for whether his rights would be violated by their willful

1348   acts and omissions, which they exercised and continue to exercise based on ethnic bias

1349   and invidiously discriminatory conduct against Baylor, which is the moving force behind

1350   the direct and proximate cause of injuries as set forth above.

1351       214. Defendants' biased conduct entitles Baylor to injunctive and other relief

1352   allowable by law. No punitive or monetary damages are sought against Defendants.

1353                                   **COUNT 3**

1354       **VIOLATION OF FOURTEENTH AMENDMENT EQUAL PROTECTION**
1355                          **(Against All Defendants)**

1356       215. Baylor re-asserts and incorporates by reference as if fully set forth herein

1357   the assertions in all preceding paragraphs.

1358       216. Equal Protection guarantees that no person will be denied the protection

under the law that is enjoyed by similar persons. Persons similarly situated must be similarly treated. Equal protection is extended when the rules of law are applied equally in all like cases and when persons are exempt from obligations greater than those imposed upon others in like circumstances.

217. Defendants violated and continue to violate Equal Protection as it relates to an unrepresented Black, such as Baylor, appearing before them in all jurisdictions of the Florida courts. By their own acts and omissions clearly shown on the face of the record, Defendants' ongoing bias against Baylor as an unrepresented Black litigant, is largely designed to benefit Whites represented by counsel. Thus it creates two classes: White parties who get the "benefit" of Notice, access to the court and opportunity to be heard, or Whites with the negotiation leverage of White counsel. Doing so, the unrepresented Black party, such as Baylor, will not receive the same benefit or tactical advantage. In all personal cases mentioned herein, including other cases cited, all attorneys of record were White, and Whites were seen given relief on that basis also. If Baylor was White, and he was represented by White counsel, he would have received the same protections.

218. Defendants violated and continue to violate Equal Protection as it relates to Baylor's gender or sex. By their own acts and omissions, as clearly shown by the record, Defendants' ongoing bias is designed largely, to benefit females only. White females or females in child support cases, who are State's interest, receive the "benefit" of Notice, access to the court and opportunity to be heard, even while absent; defenses are waived; unrepresented by legal counsel, or; fail to raise any cognizable legal or oral arguments. By Baylor's on personal accounts clearly seen on the record, and in all cases cited by

1381     him, females, White or non-White, are given substantial relief and protections over

1382     males, especially Black males, such as in Baylor cases, where the female Defendant was

1383     defended by the court in every proceeding, wherein every case, places the adversarial

1384     process between the court and Baylor, instead of between the parties. Every time.

1385         219.  Defendants have routinely and discriminatorily committed these atrocities

1386     against Baylor on more than eighty (80) occasions over the course of five (5) years.

1387         220.  According to Defendants, no particular set of laws apply to Baylor, not one.

1388     Only Baylor is adversely affected by Defendants' biased conduct in numerous suits and

1389     actions and proceedings since August 2018, as asserted herein.

1390         <u>**COUNT 4**</u>

1391     <u>**VIOLATION OF NINTH AMENDMENT RIGHT TO THINK FREELY**</u>
1392                        **(Against All Defendants)**

1393         221.  Baylor re-asserts and incorporates by reference as if fully set forth herein

1394     the assertions in all preceding paragraphs.

1395         222.  "The enumeration in the [U.S.] Constitution, of certain rights, shall not be

1396     construed to deny or disparage others retained by the people. ." meaning that the Ninth

1397     Amendment provides that it should not be construed to mean that the Constitution does

1398     not protect rights that are not enumerated.

1399         223.  Upon construing the plain meaning of the Ninth Amendment, Courts must

1400     "give undefined words in the Constitution their usual, normal, or customary meaning,"

1401     and must not deviate from "the well-established rule that the plain language of the

1402     enacted text is the best indicator of intent." <u>Nixon v. United States</u>, 506 U.S. 224, 232,

1403   113 S. Ct. 732, 122 L.Ed.2d 1 (1993).

1404   224.  Given that the United States Supreme Court has yet to define or provide an

1405   exhaustive list of "Rights" protected under the Ninth Amendment, generally, "Rights"

1406   have been defined as legal, social, or ethical principles of freedom or entitlement; that is,

1407   rights are the fundamental normative rules about what is allowed of people or owed to

1408   people, *albeit*, personal "Rights" held by an individual person which are not bestowed by

1409   law, customs, or beliefs, and which cannot be taken or given away, or transferred to

1410   another person, are referred to as "inalienable rights."

1411   225. The Ninth Amendment to the United States Constitution recognized that

1412   certain personal rights that are universal cannot be taken away by legislation, as they are

1413   beyond the control of government, being naturally given to every individual at birth, and

1414   that these personal rights are retained throughout life.

1415   226.  The framers of the Constitution acknowledged unalienable rights of man in

1416   this powerful phrase from the Declaration of Independence:

1417       "We hold these truths to be self-evident, that all
1418       men are created equal, that they are endowed by
1419       their Creator with certain unalienable Rights. . "

1420   227.  While there is no enumerated list of rights that are considered unalienable

1421   in the Constitution, one right that is generally accepted as a natural right of man, is the

1422   right to "think freely", as opposed to "freedom to believe" or "freedom to communicate"

1423   contemplated by the First Amendment, which are generic labels that pertain to freedom

1424   of religion, speech, press, and artistic expression. Both labels are affiliated with religious

1425   skepticism known as "freethinking" and "freethought." It is also coincidental with 18th-

1426   century freethinkers, often associated with libertarian causes, such as freedom of speech

1427   and press. But these controlled freedoms do not control the "right to think freely."

1428       228. The latter is inapposite to the right to "think freely," because government

1429   has the power to restrict First Amendment rights. Courts, philosophers and scholars, who

1430   have held widely differing beliefs, generally agree on the one point that, "unalienable

1431   rights" are something that cannot be taken from the people, even at the hands of the

1432   government. *See* <u>Washington v. Harper</u>, 494 U.S. 210, 110 S. Ct. 1028, 108 L.Ed.2d 178

1433   (1990)("a civilly committed person's right to be free from unwanted treatment with

1434   mind-altering drugs is a qualified one.") *Cf.* "* * * [A]ny attempt to restrict those

1435   liberties [freedom of speech and assembly] must be justified by clear public interest,

1436   threatened not doubtfully or remotely, but by clear and present danger." <u>Thomas v.</u>

1437   <u>Collins</u>, 323 U.S. 516, 530, 65 S. Ct. 315, 322, 89 L. Ed. 630 (1945). Narrow categories

1438   of First Amendment speech not protected from government restrictions are, incitement,

1439   defamation, fraud, obscenity, child pornography, fighting words, and threats. There are

1440   no categories of Ninth Amendment unalienable "right to think freely" restrictions.

1441       229. The most influential defense of "freethinking," written by Anthony Collins,

1442   a Radical Whig and literary executor of John Locke's estate is found in *A Discourse of*

1443   *Free-Thinking* (1713). Therein, Collins wrote:

1444         "By free-thinking I mean the use of the understanding in
1445         endeavoring to find out the meaning of any proposition
1446         whatsoever, in considering the nature of the evidence for or
1447         against it, and in judging of it according to the seeming force
1448         of the evidence."

1449       230. Other defenses for freethought, or "freedom of thought," appear in various

pleas for religious toleration, freedom of speech and press throughout the 17th century. One of the most influential was John Milton's book, *Areopagitica* (1644), which was cited as late as 1851 by Herbert Spencer in his Social Statics as presenting a definitive case for toleration. Milton's eloquent words —"Give me the liberty to know, to utter, and to argue freely according to my conscience, above all liberties."

231. There are many examples of "toleration," as it relates to the restriction of freedom to communicate (speech) and express certain beliefs (religion). In the case of *Larissis and Others v. Greece* (1998)[4], the European Court of Human Rights concurred with the conviction of high-ranking officers who tried to convert lower-rank soldiers to Jehovah's Witnesses. The conduct of officers was deemed "improper" undue influence. The European Court of Human Rights also suggested that improper means of influencing thoughts as it relates to religious beliefs, include exerting improper pressure on people in distress or need, violence, brainwashing, and unreasonable propaganda (Kokkinakis v. Greece, 1994)[5].

232. Defined here, "freethinking" or "freedom of thought" is synonymous with the critical investigation of a "belief" or "doctrine". Collins and other philosophers were calling for more than the legal freedom to use one's mind; they were also challenging widespread belief that some beliefs, whether in religion or politics, are sacrosanct and should therefore be immune. In other words, they were defending the moral right to freedom of thought as to speech and religion.

---

[4] Larissis and Others v. Greece (1998). 65 Eur. Ct. H.R. (ser. A) 363, 27 E.H.R.R. 329.
[5] Kokkinakis v. Greece (1994). 17 E.H.R.R. 397.

233. Even after arguments for freedom of thought had become widely accepted in Europe and America, there was a concern among philosopher, Alexis de Tocqueville, found in his work, *Democracy in America*. Tocqueville concluded, "Thought," he wrote, "is an invisible power and one almost impossible to lay hands on." Even the most absolute of European sovereigns with an unlimited power to punish the body cannot prevent the spread of seditious and unorthodox ideas within their realms or even within the confines of their own courts.

234. Thus, the "right to think freely," as opposed to "freedom of thought" which is bonded to belief of religion and expression thereof quantified by the First Amendment — is a Ninth Amendment personal right to not have one's thoughts manipulated and is recognized as settled law in many countries. The United States Supreme Court has repeatedly ruled that it is unconstitutional for government to interfere with people's thoughts. *See* Stanley v. Georgia (1969). 394 U.S. 557, 89 S.Ct. 1243, 22 L.Ed. 2d 542 (But reversed on other grounds for medical, procedural Due Process reasons).

235. The unalienable "right to think freely" does not require protection from medically induced methods to control one's mind by outside physical or chemical force, but to protect against manipulation, which means the right to be free from impermissible external influence, namely the use by States officers by way of coercion, threat or some other prohibited means against the will of the person concerned or without at least his or her implicit approval, is by no way confined to First Amendment press, religious beliefs, expression, or speech.

236. While "torture" would undoubtedly fall into this category, is a crime under

18 U.S. Code § 2340, and the rather conspicuous language is oft interpreted in a criminal context, would naturally be protected by the Eighth Amendment of the Bill of Rights, as torture is often presumptively regarded to be both cruel and unusual in its very nature.

237. In the matter of civil context, the 2009 Charter of Fundamental Rights of the European Union introduced the concept, "right to mental integrity." Article 3.1 of the Charter states that, "Everyone has the right to respect for his or her physical and mental integrity." While it does not indicate what mental integrity means though, it leaves its interpretation open to the courts. However, Mendlow (2018)[6] has defined this as; "the right to be free from unwanted mental interference or manipulation of a direct and forcible sort."

238. One modern day instance gives some guidance on what is characterized as illegitimate forms of thought manipulation, a characteristic that has been deemed to be the use of power imbalances to influence the personal "right to think freely."

239. On October, 2022, a U.S. magistrate judge in New Mexico who left the bench, earned an unusual recognition on her way out. Federal judges voted not to reappoint Carmen E. Garza after her second, eight-year term ended, but the Judicial Council for the 10th Circuit Court of Appeals said it still needed to identify "potential institutional issues" regarding the hostile work environment clerks and colleagues said she fostered during her 16 years on the bench.

240. The committee, which included 10th Circuit Chief Judge Timothy M. Tymkovich, heard of "manipulation, threats, derogatory and egregious statements about

[6] Mendlow, G. S. (2018). Why is it wrong to punish thought. Yale Law J. 127, 2342–2387.

her own staff, other employees, and judges." But one overarching consistency stood out: A palpable fear of retaliation due to those statements.

241. "The employees' fears may not have been unfounded," according to the Order[7] that publicizes details of the special committee investigation. "The Committee's investigators periodically contacted employees who were still working with Judge Garza to ensure that the judge was not further engaging in misconduct. The employees reported concerns that Judge Garza was attempting to retaliate against one or more of them in her final days on the bench." A few witness who were sent a staff-wide email, said they were worried Garza was using the clerk and Johnson "as a veiled path for retaliation against them," which echoes the assertions made in this Complaint, since the Defendants in this case often use mere clerks to issue Notices contrived as Orders of the court, under their own authority, but condoned by judges and justices as a first line of defense to retaliate against Black unrepresented litigants, such as Baylor.

242. "This was important both to allay the fears of the employees who had participated in the misconduct process, and also preserve the integrity of the Judiciary," according to the Order. The committee recommended additional training "to address the continuing lack of awareness of what specifically constitutes abusive conduct and a hostile work environment," which the Council said it will Order.

243. The Council said, "fears of retaliations are more challenging to overcome," but "the most effective way to assuage employees' fears of retaliation is to demonstrate that the Judiciary's reporting system is effective at addressing misconduct." The Order

---

[7] https://s3.documentcloud.org/documents/22417932/us-magistrate-judge-carmen-garza-order.pdf

1534    concluded, the judges' vote not to reappoint Garza "was a direct result of complainants'

1535    courage in reporting alleged misconduct," as well as guidance from the Tenth Circuit's

1536    workplace relations director and the committee's investigation.

1537    244.  Arguments against manipulating thought are likewise complained of in the

1538    previous sections of this Complaint, namely the detrimental impact to Baylor's "right to

1539    think freely." To an increasing degree, the more significant interchanges of Motions,

1540    pleadings and other court documents between Baylor and the Defendants themselves as

1541    adversaries, raise particular concern about illegitimate influence through the Defendants'

1542    outrageous and biased targeted conduct against Baylor.

1543    245.  What began the day of Baylor's hearing prior to his submission of a Motion

1544    to Disqualify CURTIS JACOBUS for attempting to strong-arm him into believing that

1545    Florida Civil courts do not hear issues of fraud, begins to explore the effects of coercive

1546    methods used to manipulate unrepresented Black litigants, who are believed to have no

1547    knowledge of the law, thus the emotional and prejudiced context of judges' own actions

1548    have shown to become increasingly more negative.

1549    246.  These acts and opinions were not exchanged on the streets or parks, but in a

1550    proceeding akin to the permanent termination of familial rights. In this view, no rational

1551    argument can be said that JACOBUS did not further violate Baylor's alleged rights by

1552    advocating on behalf of the female defendant in Baylor's case, by arguing her motion in

1553    her stead, which expresses against the spirit of the provisions of law that must be argued

1554    solely by the parties themselves, not the court, and surely not JACOBUS *suo motu*.

1555    247.  Other coercive methods included a truth-seeking mission representative of

a credibility determination, by challenging the veracity of Baylor's oral legal arguments, alleging that there was no truth to his defenses, which departs from the main premise of a pre-trial Motion to Dismiss hearing, but also makes clear JACOBUS's desirability to control Baylor's thoughts, which subsequently restricts certain acts protected by other amendments to the Constitution, such as the right to defend.

248. In such an exchange, Baylor was forced to think that his methods to restore his rights, lost, were thwarted or bypassed by the undue influence of JACOBUS's own manipulation of Baylor's right to think freely, by effectively stating he had no rights in the court which he sought fair relief. William Orville Douglas, an American jurist who served as an associate justice of the Supreme Court of the United States said, "For fear confines him and limits his scope. He stays tethered by strings of doubt and indecision and has only a small and narrow world to explore." Nature's Justice: Writings of William O. Douglas (ed. 2000).

249. JACOBUS's manipulation causes Baylor to think in ways inconsistent with what Courts have actually said. "No judge is permitted to substitute his concept of what the law ought to be for what the law actually is." In re Eriksson, 36 So. 3d 580 (Fla. 2010). Our disqualification rule was expressly designed to prevent "an intolerable adversary atmosphere" between the trial judge and the litigant. Bundy v. Rudd, 366 So.2d 440, 442 (Fla.1978). Courts are not free to play the role of advocate, and raise claims or defenses that should be left to the parties to raise. Doubleday Co., Inc v. Curtis, 763 F.2d 495, 502 (2nd Cir. 1985), cert. denied, 474 U.S. 912 (1985). "When a judge enters into proceedings and becomes a participant or an advocate, a shadow is cast upon

1578  judicial neutrality." <u>R.O. v. State</u>, 46 So. 3d 124, 126 (Fla. 3d DCA 2010).

1579  250.  Simply knowing that others are trying to persuade us can decrease the right

1580  to think freely. This is because a natural human reaction to others attempting to persuade

1581  us (Walster and Festinger, 1962)[8] or limit our choice (Brehm, 1966)[9] is to resist being

1582  persuaded, is critical in determining whether this represents "manipulation," when such

1583  techniques diminishes the capacity to reason or not.

1584  251.  Rather than be limited by manipulation, Baylor filed a Motion and affidavit

1585  to disqualify JACOBUS, which was naturally denied. Baylor's right to think freely of

1586  laws said to allow him to circumvent such resistance by limiting the salience of the

1587  attempt to influence, is gravely engendered by doubt that the law does not apply to him

1588  as a Black unrepresented male in Florida or America. Following the emphasized need for

1589  prohibition, Baylor's petition was filed because the court said, "prohibition is a proper to

1590  seek review of the denial of a motion to disqualify, and we have implicitly recognized in

1591  this context that petitioners would not have an adequate remedy through direct appeal at

1592  the conclusion of the trial." <u>Sutton v. State</u>, 975 So. 2d 1073 (Fla. 2008). But Baylor has

1593  and is forced to think that this benefit or privilege obviously does not apply to him.

1594  252.  Baylor was not aware that a court would deploy techniques such as variable

1595  application of these laws to select individuals, largely in the permitted use only to protect

1596  Whites who would face such difficulties. In such cases, this intervention arguably looks

1597  to restore lost rights for Whites only, which makes this a contentious area and likely

---

[8] Walster, E., and Festinger, L. (1962). The effectiveness of "overheard" persuasive communications. *J. Abnorm. Soc. Psychol.* 65, 395–402. doi: 10.1037/h0041172

[9] Brehm, J. W. (1966). A Theory of Psychological Reactance. Oxford: Academic Press.

problem with any attempt to regulate the "illegitimate manipulation" of the right to think freely of laws that may apply to him, when such manipulation is likely to occur when Baylor thinks and begins to know then believe he has no rights, which he clearly does not.

253. Baylor does not remain free from unwanted brainwashing, conversion, coercive or manipulative attempts to influence his right to think freely of rights that he may or should have. In short, when two (2) Motions for disqualification and three (3) petitions for prohibition are rejected by the remaining Defendants, the strong protection historically accorded to Whites pushes the bar to what constitutes extreme "illegitimate manipulation." Defendants' shared acts involve illegitimate means to influence Baylor's right to think freely of rights that should equally protect him under similar circumstance, but they do not, and he is forced not to think otherwise.

254. Conversely, Baylor is punished by retaliation for thinking of the idea that he has rights, which obtrusively foreshapes his consciousness. Not only have methods of coercion changed his right to think freely, illegitimate manipulation has disabled or circumvented Baylor's individual ability to rationally appraise information that is said to offer guarantees to all citizens under the laws of the United States, which obviously do not apply to Black Baylor. Nevertheless, it is generally the case of the conduct, attitudes or actions of the Defendants that shapes behavior to a lesser degree than what should be expected.

255. Someone who finds unwanted, unacceptable first-order conduct repugnant, but who is forced to suppress or avoid them, will naturally avoid situations that trigger

them, which would lead courts to have cause for concern for a violation of Baylor's right

to think freely under the Ninth Amendment to the United States Constitution, for which

Baylor is entitled to injunctive relief.

**COUNT 5**

**CONSPIRACY AMONGST STATE OFFICIALS**
**(Against All Defendants)**

256. Baylor re-asserts and incorporates by reference as if fully set forth herein the assertions in all preceding paragraphs.

257. Defendants have engaged and continue to engage in a long-term practice, agreement, relationship and understanding, where Defendants possessed and continue to possess the ability, as well as perceived ability, to restrict Baylor's access to appellate court procedures and Notices. Defendants continue to prevent Baylor from having access to, or knowledge of his appellate cases after Notice to Appeals or extraordinary petitions are filed or transferred; or copies of legal documents; or any written opinion that would allow him to seek review in a higher court; or a decision based on the actual merits of a case supported by facts and evidence, or; fair and impartial judges.

258. Defendants have colluded with one another in order to stymie Baylor's ability to invoke any equitable or lawful remedy, relief or redress from such actions that have occurred at every step and stage of litigation, which does not entitle him to the same procedures liberally afforded to Whites with or without attorneys, White attorneys or females who have a significant advantage over him as an Black *pro se* litigant.

259. These relationships, understandings and agreements are demonstrated on

the dates asserted herein, in all appellate and post-review cases, where Defendant's have either; intentionally delayed and denied Baylor's cases as moot; dismissed his cases without any Notice; dismissed with decisions made under color of law inapplicable to the case, situation or circumstance; and under the authority of mere clerks or in place of one another, at, or on behalf of judges or justices supporting the unlawful conduct taking place.

260. Defendants have agreed with and engaged in, or concerted action with one another to participate in a conspiracy to do acts that deprived and continues to deprive Baylor of his federally protected rights purported to be guaranteed by the Constitutions, including the Fourteenth Amendment right to be free government interference, the First Amendment right to petition government for grievances, and Fourteenth Amendment Equal Protection rights, as asserted herein.

261. Defendants also proactively assist one another in ensuring that Baylor has no means of challenging their illicit acts, such as the numerous denials of prohibition as against biased judges a prime example, which are attempts to forcibly stop Baylor from having his fair day in any court to procure rights purported to be allegedly protected by laws applicable to Whites only.

262. Defendants shared the common goals of utilizing the power and discretion by abuse to assist in leveraging said power for the unfair benefit of Whites - especially against *pro se* Black parties such as Baylor, who cannot afford legal counsel, as opposed to White litigants or females similarly situated, represented by White attorneys.

263. Defendants acted and continue to act under color of state law by conspiring

1664 with one or more state officials to deprive Baylor of his federally protected rights.

1665     264. As a direct and proximate result of the will to conspire and manipulation

1666 between Defendants, Baylor has suffered violations of his federally protected rights, for

1667 which he is entitled to injunctive relief.

1668 **COUNT 6**

1669 **VIOLATION OF THE FEDERAL FAIR HOUSING ACT**

1670 **(Against Brian D. Lambert, F. Rand Wallis, James A. Edwards, Eric J. Eisnaugle,**
1671 **John M. Harris, Sandra B. Williams, Charles T. Canady, Ricky Polston, Jamie R.**
1672 **Grosshans, Jorge Labarga, John D. Couriel, John Tomasino and Mark Clayton)**

1673     265. Baylor re-asserts and incorporates by reference as if fully set forth herein

1674 the assertions in all preceding paragraphs.

1675     266. Under Sec. 818. [42 U.S.C. 3617] of the Fair Housing Act, "It shall be

1676 unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or

1677 enjoyment of, or on account of his having exercised or enjoyed, or on account of his

1678 having aided or encouraged any other person in the exercise or enjoyment of, any right

1679 granted or protected by. . . this title."

1680     267. Baylor is an aggrieved person as defined pursuant to the Fair Housing Act,

1681 42 U.S.C. § 3602(i), and as a direct and proximate result of Defendants' discriminatory

1682 interference, Baylor has sustained injury.

1683     268. Defendants' practice, custom and policy of using mere court clerks to act as

1684 a first line of defense in cases brought by *pro se* Blacks, bars Baylor from receiving any

1685 Notice in his appellate cases as described herein, thus constitutes interference against the

1686 exercise or enjoyment of the rental of housing.

269. On that basis, courts have found various acts of delay in court proceedings and suppression of documents constitute an impermissible burden on the right of access to courts:

> 270.   *See* Jackson v. Procunier, 789 F.2d 307, 311 (5th Cir. 1986)("Any deliberate impediment to access, even a delay of access, may constitute a constitutional deprivation"); Ryland v. Shapiro, 708 F.2d 967, 973 (5th Cir. 1983)(conduct which interferes with the right to institute a suit constitutes actionable impediment to right of access); Rheuark v. Shaw, 628 F.2d 297, 302 (5th Cir. 1980)(conduct by state officers which delays appellate process may prejudice right of access to courts); McCray v. Maryland, 456 F.2d 1, 6 (4th Cir. 1972)(right of access violated where court official, by refusal or neglect, impedes the filing of court papers); Crews v. Petrosky, 509 F. Supp. 1199, 1204 (W.D.Pa. 1981)(allegation that clerk of court delayed filing of a petition for appeal may state valid claim for violation of right of access).

271.  Defendants have declined to provide Baylor with any Notice as required by the State's Rules, Statutes and administrative Orders following the filing of Notice of Appeal in a case for the determination of rights to housing.

272.  Defendants' practice and custom of interfering with Baylor's housing rights interferes with his requests or demands, explicitly, in connection with: the renting or availability of a dwelling; the terms, conditions, or privileges of the renting; and the provision of services or facilities in connection to renting.

273.  Defendants have declined to provide extraordinary relief against the refusal to provide Notice after filing Notice of Appeal, under the State's law.

274. Because Defendants' bias is discriminatorily aimed at Baylor in order to deny him the right to the exercise his right to fair housing, which is intentional, willful,

1715   and in reckless disregard for Baylor's rights and disparately impacts Blacks, accordingly,

1716   pursuant to 42 U.S.C. § 3613(c), Baylor is entitled to actual injunctive relief.

1717   **COUNT 7**

1718   **VIOLATION OF THE FLORIDA FAIR HOUSING ACT**

1719   **(Against Brian D. Lambert, F. Rand Wallis, James A. Edwards, Eric J. Eisnaugle,**
1720   **John M. Harris, Sandra B. Williams, Charles T. Canady, Ricky Polston, Jamie R.**
1721   **Grosshans, Jorge Labarga, John D. Couriel, John Tomasino and Mark Clayton)**

1722   275.   Baylor re-asserts and incorporates by reference as if fully set forth herein

1723   the assertions in all preceding paragraphs.

1724   276.   Under §760.37 of the Florida Fair Housing Act, "It is unlawful to coerce,

1725   intimidate, threaten, or interfere with any person in the exercise of, or on account of her

1726   or his having exercised, or on account of her or his having aided or encouraged any other

1727   person in the exercise of any right granted under ss. 760.20-760.37."

1728   277.   Baylor is an aggrieved person as defined under Florida's Fair Housing Act,

1729   §760.35(2), and as a direct and proximate result of Defendants' interference, Baylor has

1730   sustained injury.

1731   278.   Defendants' practice, custom and policy of using mere court clerks to act as

1732   a first line of defense in cases brought by *pro se* Blacks, bars Baylor from receiving any

1733   Notice in his appellate cases as described herein, thus constitutes interference against the

1734   exercise or enjoyment of the rental of housing.

1735   279.   On that basis, courts have found various acts of delay in court proceedings

1736   and suppression of documents constitute an impermissible burden on the right of access

1737   to courts:

280.   *See* <u>Jackson v. Procunier</u>, 789 F.2d 307, 311 (5th Cir. 1986)("Any deliberate impediment to access, even a delay of access, may constitute a constitutional deprivation"); <u>Ryland v. Shapiro</u>, 708 F.2d 967, 973 (5th Cir. 1983)(conduct which interferes with the right to institute a suit constitutes actionable impediment to right of access); <u>Rheuark v. Shaw</u>, 628 F.2d 297, 302 (5th Cir. 1980)(conduct by state officers which delays appellate process may prejudice right of access to courts); <u>McCray v. Maryland</u>, 456 F.2d 1, 6 (4th Cir. 1972)(right of access violated where court official, by refusal or neglect, impedes the filing of court papers); <u>Crews v. Petrosky</u>, 509 F. Supp. 1199, 1204 (W.D.Pa. 1981)(allegation that clerk of court delayed filing of a petition for appeal may state valid claim for violation of right of access).

281.   Defendants have declined to provide Baylor with any Notice as required by the State's Rules, Statutes and administrative Orders following the filing of Notice of Appeal in a case for the determination of rights to housing.

282.   Defendants' practice and custom of interfering with Baylor's housing rights interferes with his requests or demands, explicitly, in connection with: the renting or availability of a dwelling; the terms, conditions, or privileges of the renting; and the provision of services or facilities in connection to renting.

283.   Defendants have declined to provide extraordinary relief against the refusal to provide Notice under the State's law.

284.   Because Defendants' bias is discriminatorily aimed at Baylor in order to deny him the right to the exercise of fair housing, which is intentional, willful, and in reckless disregard for Baylor's rights and disparately impacts Blacks, accordingly, pursuant to §760.35(4), Baylor is entitled to actual injunctive relief.

**COUNT 8**

**VIOLATION OF THE TITLE VI OF THE CIVIL RIGHTS ACT**
**(Against All Defendants)**

285.   Baylor re-asserts and incorporates by reference as if fully set forth herein the assertions in all preceding paragraphs.

286.   Title VI of the Civil Rights Act of 1964 prohibits discrimination on the basis of race, color, or national origin in. . activities receiving federal financial assistance, including court activities. Title VI prohibits intentional discrimination on the basis of race or ethnicity. It prohibits courts from declining to issue Black unrepresented litigants of Notice based on racial and ethnic profiling. It also prohibits courts from refraining from providing copies of legal documents upon request in a manner that has a discriminatory effect on a racial or ethnic group, and is motivated by a discriminatory purpose.

287.   Defendants receive substantial amounts of Federal financial assistance, including assistance under Florida's "Pandemic Recovery Plan," and "Coronavirus State and Local Recovery Funds," which provides $195.3 billion to the States and the District of Columbia under the American Rescue Plan Act of 2021.

288.   Defendants developed, implemented, enforced, encouraged, and sanctioned a policy, practice, and custom of barring Baylor, who is Black, from further receiving Notice or copies of any legal documents filed in his cases, which results in a significant disparate impact on Blacks who complain of Civil Rights violations.

289.   Baylor is subjected to bias and racial discrimination under Defendants' who form a common enterprise. The Supreme Court elaborated that an enterprise is a "group

1787   of persons associated together for a common purpose of engaging in a course of

1788   conduct." United States v. Turkette, 452 U.S. 576, 583, 101 S.Ct. 2524, 69 L.Ed.2d 246

1789   (1981).

1790   　　　290.   As a direct and proximate result of the above-mentioned policies, practices,

1791   customs, and acts against Baylor who has suffered and continues to suffer injuries, and

1792   has been deprived and continues to be deprived of his rights alleged to exist under Title

1793   VI of the Civil Rights Act, without appropriate injunctive relief, these violations will

1794   continue to occur.

1795   **VI.   PRAYER FOR RELIEF**

1796   　　　WHEREFORE, Baylor respectfully request the following relief:

1797   a)   A declaratory judgment, pursuant to 28 U.S.C. § 2201, that Florida Statute

1798   　　　§ 83.60 is unconstitutional on its face and cannot be used to supersede Due

1799   　　　Process, Equal Protection or Civil Rights of indigent Defendants unable to

1800   　　　afford to pay money into a court registry for the right to defend and appeal,

1801   　　　equivalent to an indigents inability to pre-pay court costs and fees, since the

1802   　　　impact is disparate and greater amongst indigents and Blacks;

1803   b)   A declaratory judgment, pursuant to 28 U.S.C. § 2201, that the Defendants'

1804   　　　practice, policy or custom of denying Baylor a copy of legal documents in

1805   　　　all his appellate cases, is contrary to Fla. R. App. P. 9.420(c) and §35.15, as

1806   　　　challenged herein and requested thereto in State court, and violates Baylor's

1807   　　　First and Fourteenth Amendment rights, and Supremacy Clause to the U.S.

1808   　　　Constitution, including Civil Rights;

c) A declaratory judgment, pursuant to 28 U.S.C. § 2201, that the Defendants' practice, policy and custom denying Baylor the right to a fair and impartial decision-maker, violates Baylor's Fourteenth Amendment right to the U.S. Constitution;

d) A declaratory judgment, pursuant to 28 U.S.C. § 2201, that the Defendants' practice, policy and custom denying Baylor the right to Notice in all of his appellate cases, violates Baylor's Fourteenth Amendment right to the U.S. Constitution;

e) A declaratory judgment, pursuant to 28 U.S.C. § 2201, that the Defendants' practice, policy and custom of using coercion and illegitimate manipulation to control his decisions and outcome of his cases violates Baylor's Ninth Amendment right to the U.S. Constitution;

f) A declaratory judgment, pursuant to 28 U.S.C. § 2201, that the court clerks' practice, policy and custom of signing, issuing and enforcing Notices as valid court Orders is beyond the statutory and constitutional authority given by law, and violates Baylor's First, Fourteenth and Ninth Amendment right to the U.S. Constitution;

g) A declaratory judgment, pursuant to 28 U.S.C. § 2201, that the Defendants' actions, as set forth above, are biased and discriminatory enterprise action, and otherwise inconsistent with;

h) A declaratory judgment, pursuant to 28 U.S.C. § 2201, that the Defendants' actions, as set forth above, are biased and discriminatory interference with

1831        fair housing rights, and otherwise inconsistent with law;

1832    i)  Preliminary and permanent or temporary injunction enjoining Defendants

1833        from denying Baylor the right to Notice in his civil appellate proceedings;

1834    j)  Preliminary and permanent or temporary injunction enjoining Defendants

1835        from denying Baylor a copy of the 5th DCA's final opinion entered on or

1836        about August 2022;

1837    k)  Preliminary and permanent or temporary injunction enjoining Defendant

1838        Curtis Jacobus, from further participating in Baylor's civil cases and all

1839        related matters;

1840    l)  Preliminary and permanent or temporary injunction enjoining Defendant

1841        Charles T. Canady, Ricky Polston, Jamie R. Grosshans, Jorge Labarga and

1842        John D. Couriel, from further participating in Baylor's review cases and all

1843        related matters;

1844   m) Preliminary and permanent or temporary injunction enjoining Defendant

1845        Brian D. Lambert, F. Rand Wallis, James A. Edwards, Eric J. Eisnaugle

1846        and John M. Harris, from further participating in Baylor's appellate cases

1847        and all related matters;

1848    n)  Preliminary and permanent or temporary injunction enjoining Defendant

1849        Robert Morris, Patricia J. Kelly, Craig C. Villanti, Suzanne Labrit, Daniel

1850        H. Sleet, and Anthony K. Black, from further participating in Baylor's

1851        appellate cases and all related matters;

1852    o)  Preliminary and permanent or temporary injunction enjoining Defendant

John Tomasino, Mark Clayton, Mary Elizabeth Kuenzel and Sandra B. Williams, from further participating in Baylor's appellate and review cases and all related matters;

p) Preliminary and permanent injunction enjoining Defendant John Tomasino, Mark Clayton, Mary Elizabeth Kuenzel and Sandra B. Williams, from further signing, issuing and enforcing Notices masked as Orders without an actual or real signature by a judge/judges or justice/justices in Baylor's appellate and review cases and all related matters;

q) Preliminary and permanent injunction enjoining Defendant John Tomasino, Mark Clayton, Mary Elizabeth Kuenzel and Sandra B. Williams, from further signing, issuing and enforcing Notices masked as Orders to dispose of Constitutional, Civil Rights or fundamental rights in Baylor's appellate and review cases and all related matters;

r) The opportunity to amend or modify this Complaint as necessary;

s) Such other relief as the Court may deem just and proper under the law, or *ex gratia*, or through discretion, or in the interests of justice, or as a matter of justice.

*I certify under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct.*

April  24, 2023

Christopher Gary Baylor
AAFA Advocate
3206 South Hopkins Avenue, Suite 43
Titusville, Florida 32780-5667
Telephone: (484) 682-2605
Facsimile: (972) 466-9473
cbaylor@aafa-law.org